746 F.2d 945
 17 Fed. R. Evid. Serv. 167
 UNITED STATES of America, Plaintiff,
v.
Samuel J. RUSSOTTI, Rene Piccarreto, Richard J. Marino,
Thomas E. Marotta, Joseph R. Rossi, Anthony M. Colombo,
Donald J. Paone, Joseph J. Trieste, Joseph L. Ladolce and
John M. Trivigno, Defendants.
In the Matter of Peter PECORA, Appellant.
 No. 474, Docket 84-6298.
 United States Court of Appeals,
Second Circuit.
 Submitted Oct. 18, 1984.
Decided Oct. 22, 1984.
 
 Henry L. Jesserer, III, Rochester, N.Y. (Jesserer, Andolina & Lamb, Rochester, N.Y., on the brief), for appellant.
 William C. Bryson, Dept. of Justice, Washington, D.C. (Salvatore R. Martoche, U.S. Atty., Buffalo, N.Y., on the brief), for the U.S.
 Before NEWMAN, CARDAMONE and DAVIS,* Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 Peter Pecora, a Rochester, New York, police officer, appeals from an order of the District Court for the Western District of New York (Thomas C. Platt, Judge, sitting by designation), adjudicating him in civil contempt and imposing a coercive fine for his refusal to obey the Court's direction to disclose the names of two informants. The contempt adjudication occurred during the course of a criminal trial that is currently in progress. For reasons that follow we hold that Pecora was entitled to invoke a privilege against disclosing the names of his informants and therefore vacate the adjudication of contempt.
 
 FACTS
 
 2
 Pecora was called as a witness for the prosecution in the course of a trial of ten defendants on racketeering charges. United States v. Russotti, No. 82-156 (W.D.N.Y.). See United States v. Russotti, 717 F.2d 27 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984) (affirming denial of motion to dismiss pending charges on double jeopardy grounds). On direct examination on September 24, 1984, Pecora was asked about a conversation he had had with defendant Thomas Marotta in 1978. Pecora testified that he had brought to Marotta's attention information reported to Pecora by two informants concerning a "mob war" in Rochester and had asked Marotta to comment on the information. The information included identification of two of the defendants, Samuel J. Russotti and Rene Piccarreto, as members of an organized crime group in Rochester. Pecora testified that Marotta generally confirmed the accuracy of the informants' information and that Marotta indicated that the statement of the second informant was the more accurate. Pecora's testimony is set out in the margin.[1]
 
 
 3
 At the conclusion of Pecora's direct examination, defense counsel moved to strike his conversation with Marotta on various grounds including a hearsay objection to the report of the two informants. The prosecutor sought to retain the testimony on the theory that the informants' information was not offered for its truth, that it became admissible against Marotta only to the extent that he adopted it, and that Marotta's declarations were admissible against his co-defendants as statements in furtherance of a conspiracy. During the colloquy Judge Platt stated that he expected to be confronted with the issue of whether Pecora would have to disclose the identity of his informants and indicated that he expected that an objection by the prosecutor would not succeed. Later in the colloquy the prosecutor advised that Pecora would not reveal the identities of his informants. Judge Platt then informed the prosecutor that he faced the choice of either revealing the names of Pecora's informants or having Pecora's testimony stricken. When the prosecutor inquired if the Court contemplated other sanctions beyond striking the testimony, Judge Platt replied that if the defendants request that Pecora be directed to answer and if such a direction were to be given and not obeyed, Pecora would face sanctions "like any other witness."
 
 
 4
 Further colloquy ensued the next day, during which the prosecutor stated that he was offering Pecora's testimony concerning the informants' information and Marotta's response only against Marotta. Judge Platt thereupon instructed the jury that the evidence was to be considered only against Marotta and that the statements of the two informants were not to be considered for their truth "except to the extent, if at all, you find and are satisfied beyond a reasonable doubt that any portion of the same was, or portion or portions of the same, were adopted by the defendant Marotta." Later that day, Judge Platt refined this instruction to permit the jury to consider the informants' statements for their truth only to the extent that Marotta "affirmatively" adopted them, thereby precluding adoption by silence.
 
 
 5
 In response to Judge Platt's indication that he would require disclosure and Pecora's resistance to disclosure, the prosecutor moved on October 3 that Pecora's testimony concerning his conversation with Marotta be stricken. Defense counsel made no objection, after receiving an assurance from the District Judge that they could cross-examine Pecora and probe his credibility by cross-examining with respect to the officer's reports that included the content of his conversations with his informants. The Judge then instructed the jury that he had granted a motion to strike Pecora's testimony concerning the conversation with Marotta and that his testimony, previously admitted against Marotta, was now to be disregarded.
 
 
 6
 At that point defense counsel began their cross-examination of Pecora. Counsel for Piccarreto asked Pecora to name his two informants, and Pecora refused. At counsel's request, Judge Platt directed Pecora to answer, and the witness persisted in his refusal. Several other defense counsel elicited from Pecora an acknowledgement that he would refuse to disclose his informants' identities if they asked the same questions. On redirect examination, the prosecutor sought to elicit the reasons for Pecora's refusal to disclose his informants' identities. In the absence of the jury, Pecora said that he relied upon the need to maintain his effectiveness as a police officer and the effectiveness of law enforcement in the community as well as his concern for the safety of his informants. Judge Platt ruled that the prosecutor could not elicit the safety concern on redirect examination, whereupon the prosecutor withdrew his effort to elicit the reasons for Pecora's refusal.
 
 
 7
 At the conclusion of Pecora's examination, out of the presence of the jury, Judge Platt asked whether any defense counsel wished to move to have the witness held in contempt. None of the defense counsel made such a motion. Two defense lawyers elicited from Pecora that he would refuse to answer even if incarcerated or subjected to a daily fine. Defense counsel made clear that they would not seek a contempt remedy. Instead, they urged the District Judge either to strike all of Pecora's testimony or to grant a mistrial. At that point Judge Platt, on his own motion, fined Pecora $100 a day until he complied with the Court's direction to answer. A brief stay was entered to permit Pecora to seek a further stay from this Court.
 
 
 8
 The next day, October 4, Judge Platt heard argument from counsel for Pecora concerning the civil contempt adjudication. In the course of that hearing, Judge Platt took testimony from Pecora in camera, with only the witness and his counsel present. Apparently responding to a contention previously made by defense counsel that Pecora's source might not be live informants but instead might be some unlawful surveillance, Judge Platt asked Pecora to name his informants, assuring him that his testimony would be sealed. Pecora named his informants. That portion of the record remains under seal.
 
 
 9
 Resuming the hearing in open court with all counsel present, Judge Platt again ascertained that Pecora would not publicly identify his informants. The Judge then stated that he had no alternative but to hold Pecora in contempt. Explaining his concern, Judge Platt said that even though he had instructed the jury to disregard the testimony, it may be "embedded in their minds" and it "may carry weight with them." That possibility, he continued, created "a risk of a re-trial." In the Judge's view, the risk of retrial of the protracted case, already in progress for several weeks, required disclosure of the informants' identities in the public interest when compared to the interests in maintaining their names in confidence. To coerce disclosure, Judge Platt amended his civil contempt sanction to provide that as of October 10, the daily fine would double each day until a maximum of $50,000 was reached. This Court entered a stay on October 10 and expedited the appeal.
 
 DISCUSSION
 
 10
 This adjudication of civil contempt is unusual in several respects. First, in the typical case where a trial court overrules a law enforcement official's assertion of a privilege not to disclose the identity of an informant, the prosecution is then confronted with a choice either to disclose or to suffer an adverse consequence to its case. For example, if the informant's identity is deemed essential to a determination of the existence of probable cause, the adverse consequence will be the granting of a motion to suppress. See United States v. Tucker, 380 F.2d 206, 213-14 (2d Cir.1967); United States v. Robinson, 325 F.2d 391, 394-95 (2d Cir.1963). Or, if the refusal occurs during trial, the adverse consequence will be the striking of testimony or, in extreme cases, a forgoing of the entire prosecution. See Roviaro v. United States, 353 U.S. 53, 61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). In all such cases, the prosecution is given the option of deciding whether to disclose or suffer consequences to its case; the witness is not coerced through the imposition of civil contempt sanctions. This case, however, involves an assertion of the informant's privilege by a law enforcement officer of a jurisdiction different from that of the prosecutor. In this circumstance, the prosecuting authority is not necessarily in a position to determine whether to make disclosure. The absence of the normal choice a prosecutor is entitled to make has created the occasion for the civil contempt adjudication in this case.
 
 
 11
 Second, this is the rare, if not unprecedented, instance of a civil contempt sanction imposed in the absence of any request by the parties who sought and obtained the court order that has been defied. Indeed, such a request was explicitly disavowed.[2] Moreover, none of the defendants has submitted any papers in this Court in opposition to Pecora's appeal. At least in the context of civil litigation, it has been held that a civil contempt for failure to obey a court order may not be initiated by the trial judge, but is a remedy available only for the benefit of the parties who obtained the order in issue. MacNeil v. United States, 236 F.2d 149, 153-55 (1st Cir.), cert. denied, 352 U.S. 912, 77 S.Ct. 150, 1 L.Ed.2d 119 (1956); Palmigiano v. Garrahy, 448 F.Supp. 659, 670 (D.R.I.1978). Vindication of the court's authority is normally accomplished by criminal contempt. We are doubtful that a civil contempt sanction may be imposed without a request of a party, even where, as here, the order sought to be enforced is entered in a criminal case. In the brief time available for research, we have found no case permitting such a practice in the course of either civil or criminal litigation. We need not rest decision on the absence of a motion for civil contempt, however, for we are satisfied that the order disobeyed should not have been issued.
 
 
 12
 It has consistently been held that an informant's identity need not be disclosed unless "essential to the defense." Scher v. United States, 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938). See Rugendorf v. United States, 376 U.S. 528, 535, 84 S.Ct. 825, 829, 11 L.Ed.2d 887 (1964); Roviaro v. United States, supra, 353 U.S. at 61, 77 S.Ct. at 628; United States v. Lilla, 699 F.2d 99, 105 (2d Cir.1983); United States v. Ortega, 471 F.2d 1350, 1359 (2d Cir.1972), cert. denied, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973). Disclosure has been required at trial where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence. See United States v. Barnes, 486 F.2d 776, 779-81 (8th Cir.1973); United States v. Barnett, 418 F.2d 309, 311-12 (6th Cir.1969); United States v. Roberts, 388 F.2d 646, 648-50 (2d Cir.1968).
 
 
 13
 The standard for requiring disclosure was not met in this case. There is no indication that either of Pecora's informants were key witnesses to any of the alleged offenses or participants in those offenses. Nor was disclosure required to rebut damaging evidence in the case; Judge Platt had already granted the Government's motion to strike Pecora's testimony concerning what the informants had said and what Marotta had stated upon hearing their information from Pecora. In colloquy with Judge Platt, defendants urged that disclosure was required to enable them to probe Pecora's credibility. That is normally an insufficient basis to overcome the informant's privilege. See United States v. Soles, 482 F.2d 105, 109 (2d Cir.), cert. denied, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973). If regularly countenanced, it would erode the privilege, for an argument could always be made that disclosure is needed to challenge the credibility of the witness who reports an informant's declarations.
 
 
 14
 We appreciate the concern expressed by the conscientious Trial Judge, who was suddenly confronted with a difficult situation attributable in part to the manner in which the prosecutor presented his evidence. It would have been far more prudent for the prosecutor, knowing he was going to elicit declarations of informants whose identities he was not in a position to disclose, to alert the Judge to the potential problem in a pretrial memorandum and to offer to present the critical testimony in a brief voir dire outside the presence of the jury. Having been thus confronted with the problem, the Judge was understandably anxious to minimize the risk of a retrial. However, if the risk of a retrial can ever justify displacement of the informant's privilege, it surely cannot do so in this case. That risk will arise in this case only if, upon an appeal from any ensuing conviction, a reviewing court were to determine that the jurors used the informants' declarations adversely to the defendants, despite the instruction to disregard the testimony, that disclosure of the informants' identities would have enabled the defendants to lessen the effect of such adverse use, and that the adverse effect was of sufficient gravity, in light of the trial record as finally completed, to prejudice the substantial rights of the defendants.[3] Though we cannot and do not adjudicate what an appellate court will do upon an appeal from any ensuing conviction in this case, we hold that, at the point where Pecora asserted his privilege, the risk of a retrial based on non-disclosure of the informants' identities was far too insubstantial to warrant an order requiring disclosure.
 
 
 15
 Since an adjudication of civil contempt "falls with an injunction which events prove was erroneously issued," United States v. United Mine Workers, 330 U.S. 258, 295, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947), our holding that disclosure should not have been ordered necessarily vitiates the adjudication of civil contempt and the accompanying sanctions.
 
 
 16
 The order of civil contempt is vacated. The mandate shall issue forthwith.
 
 
 
 *
 The Honorable Oscar H. Davis of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Q. What did you tell Mr. Marotta?
 A. Told him that the first man had told me that--that after the beating of the guys that were left in charge, not all of them were accepted back. The ones that weren't accepted back were--were cut off from any jobs in the organization. They weren't to associate with any of the members in the organization. And these were the men that were visible at the coming home party, and these were the people--or the men that had formed the B team faction.
 I also told Mr. Marotta that the man--first man had stated [colloquy concerning objection by defense counsel]
 Q. What else did you tell him?
 A. I also told Mr. Marotta that the first man stated that Sammy Gingello had declared himself over Samuel Russotti and Rene Piccarreto, and that there was no more equal power.
 I also told him that the man had stated to me that at approximately two weeks after the murder of Sammy Gingello that the A and the B team had a meeting, and it was suggested that this city be split into two parts with the river--or Main Street being the dividing line; that the A team found this acceptable, but the B team did not, and was primarily opposed to Sonny Celestino, and nothing was resolved at this meeting.
 The bombings continued, and--both the A and B team became disorganized. He also stated that the A team was losing its hold by not being effective in taking care of the B team. Also stated to--
 [colloquy concerning objection by defense counsel]
 Q. What else did he tell you?
 A. I also told Mr. Marotta that the first man had stated that--that several days earlier the A team had learned that Sonny Celestino was observed in Binghamton, New York, and that the A team had recruited members of a motorcycle gang to go there and look for him.
 I then told Mr. Marotta what the second man had stated to me.
 Q. What did you tell him the second man had stated to you?
 A. The second man stated that in regards to the beating incident, that the whole problem would have ended with the beatings, but then the pipe bomb was found on Clifford Avenue and that started it all over again.
 He stated that--the second man stated that the power structure of Samuel Gingello, Red Russotti and Rene Piccarreto was the same when they got out of jail as it was when they went to jail.
 He also stated that the A team was suffering financially as a result of the bombings, and they were having difficulty--the A team was having difficulty--difficulty locating members of the B team.
 He also stated that the problem would not be resolved unless at least these people are eliminated.
 He also stated that members of the motorcycle club were probably the people that associated with Thomas Torpey.
 After telling him these things, Mr. Marotta responded only by saying that he agreed with--with the beatings, what happened in the beatings, but he said there was--he was not sure that exactly happened because he was in jail at the time.
 He did say that--those members, those men, were told that--
 [colloquy concerning objection by defense counsel]
 Mr. Marotta stated that those guys were given a chance. They were told to go where they got to go, do what they got to do, but leave.
 He said then Sammy Gingello was murdered and here we are. He finished commenting about what those two men said by saying that he felt that the second man that I talked to, he felt, was closer to the truth.
 
 
 [2]
 At least one defense counsel expressed satisfaction with the situation then existing without an adjudication of civil contempt: He could attack Pecora's credibility by reminding the jury of his refusal to obey an order of the Court and, in the event of conviction, he could appeal on the ground that it was error to deny his motion for a mistrial
 
 
 [3]
 To minimize any possibility of prejudice the Government offered to stipulate that the informants, if called to testify, would deny making the statements attributed to them by Pecora. Defense counsel did not accept this stipulation