**Kenneth GILMORE, Jr., Petitioner-Appellant,**

**v.**

**Robert J. HENDERSON, Robert Abrams, and Elizabeth Holtzman, Respondents-Appellees.**

**No. 1226, Docket 86–2443.**

United States Court of Appeals, Second Circuit.

Argued May 28, 1987.

Decided July 31, 1987.

Martin B. Adelman, P.C., New York City, for petitioner-appellant.

Richard T. Faughnan, Asst. Dist. Atty., Kings County, Brooklyn (Elizabeth Holtzman, Dist. Atty., Kings County, Barbara D. Underwood, Asst. Dist. Atty., Kings County, Brooklyn, N.Y., of counsel), for respondents-appellees.

Before LUMBARD, WINTER and MINER, Circuit Judges.

LUMBARD, Circuit Judge:

In 1981, after four trials, a New York state jury found Kenneth Gilmore, Jr. guilty of murder in the second degree, attempted murder in the second degree, and criminal possession of a weapon. Gilmore received concurrent sentences of twenty-five years to life on the murder count, seven-and-one-half years to fifteen years on the attempted murder count, and three-and-one-half years to seven years on the weapons possession count. In 1985, the New York Court of Appeals affirmed Gilmore's conviction. *People v. Gilmore,* 66 N.Y.2d 863, 498 N.Y.S.2d 752, 489 N.E.2d 721 (1985). The Court of Appeals acknowledged that "the trial court improperly impeded defendant's ability 'to present his own witnesses to establish a defense,'" but concluded that the error was harmless. 66 N.Y.2d at 867, 498 N.Y.S.2d 752, 489 N.E.2d 721. In a thorough and persuasive opinion, Judge Meyer dissented. *Id.* at 867, 498 N.Y.S.2d 752, 489 N.E.2d 721.

On November 10, 1986, Judge Neaher entered an order in the Eastern District denying Gilmore's petition for a writ of habeas corpus, 646 F.Supp. 1528. As the Court of Appeals had before him, Judge Neaher found that the trial court had violated Gilmore's constitutional rights to present witnesses in defense but deemed those violations harmless. Gilmore now appeals. Because we do not believe that these violations of Gilmore's constitutional rights were harmless beyond a reasonable

doubt, we remand to the district court with instructions to grant the writ unless Gilmore is retried within a reasonable time.

In the early morning of June 6, 1976, Theodore Gross was fatally shot at point blank range while driving his car. Bullet fragments also severely injured his companion, Melita Sneed, who was seated next to him in the passenger seat. Two other men were in the car—Kenneth Gilmore, the defendant, and George Murdock, the prosecution's primary witness—both sitting in the back seat.

For over a year, Gilmore had worked as the night manager at the Webster Bowling Lanes in the Bronx. Murdock, who was on parole for armed robbery, had been recently hired at the same bowling alley. Because of his participation in a bowling league, Gross frequented the alley, and occasionally ate and drank with Gilmore.

At about 4:00 a.m. on June 6, Gross offered to drive Gilmore and Murdock home to Brooklyn after they closed up the bowling alley. Murdock had previously met Gross only once or twice. On the way, the group made a brief stop at a club in the Bronx called "Rosie's Walk-in" and then, at Gilmore's request, stopped at an after-hours club in Brooklyn named "Tears of Darkness." Gilmore and Murdock went into the club for about fifteen minutes, while Gross and Sneed ran the car through a nearby carwash. When they returned, Gilmore sat behind Gross in the left rear seat; Murdock sat behind Sneed in the right rear seat. Gilmore then suggested that Gross drop Murdock off at a nearby bus stop, where Murdock could board a bus to take him home. As the car slowed, Gross was shot three times.

Gilmore and Murdock told different stories about that night's event, each accusing the other of being the killer. Murdock testified that when Gilmore and he went into "Tears of Darkness," Gilmore left him alone for fifteen minutes. When Gilmore returned, he stated that he was going to kill Gross and Sneed and that Murdock could stay or he could leave, a decision which Gilmore would respect. Murdock ig-nored these comments because he thought Gilmore was joking.

Murdock testified further that when Gross pulled over to drop him off at the bus stop, Gilmore reached down into a burlap sack between his feet, and, when he sat up, shots rang out. Murdock said he never saw a gun or heard Gilmore say anything about a gun. Gilmore and he then jumped out of the car, took the subway one stop, and grabbed a cab. Gilmore told Murdock that he should say that the two of them took a train home from work. Murdock then went home, did not contact the police, and told his wife that she was to say that he had been with her the entire evening.

Gilmore testified that when Gross pulled over to drop off Murdock, he bent down to tie his shoes. At the same time, Murdock pulled a gun out of his bag, Gilmore exclaimed, "A gun," and Murdock began firing. After the two got out of the car, Murdock pointed the gun at Gilmore and said, "If you don't keep your mouth shut, you're going to get the same thing."

Sneed testified that when Gilmore asked Gross to drop off Murdock, she turned around and saw Gilmore bend down and say something about "checking his gun or pistol": She could not remember the exact comment and admitted that immediately after the accident she had been unsure what Gilmore had said. She then heard gunshots and realized that she had been hit. She did not see either Gilmore or Murdock with a gun. ˙

The day after the shooting, Gilmore took a bus to South Carolina. The prosecution repeatedly contrasted Gilmore's flight with Murdock's conduct, emphasizing this distinction between the two suspects. At trial, Gilmore attempted to explain that his fear of the police rather than his consciousness of guilt motivated his flight; he called his sister-in-law, Dolores Dayton, to testify that detectives had come to her home, armed with shotguns, looking for Gilmore and that they had pointed their guns at a male relative when he arrived, believing him to be Gilmore. Dayton then telephoned the Arion Manor, a catering house where Gilmore was attending a christening, and gave

the message about the police to Gilmore's mother-in-law, who relayed it to Gilmore.

The trial court ruled the testimony of Dayton inadmissible, stating that "the defendant has the option of explaining anything he wants to explain when he takes the stand." When Gilmore tried to explain what he had learned from his mother-in-law during his own testimony, however, the trial court, *sua sponte,* refused to allow him to do so.

Robert Glover also testified for the prosecution. Glover, a convicted felon with a history of cooperation with the district attorney's office, had a pending felony charge reduced to a misdemeanor—and received time served—in exchange for his testimony. He claimed to be an acquaintance of Gilmore's from Brooklyn. When the two met in a holding cell, Glover contended, Gilmore confessed that he had killed Gross because of a drug related dispute and offered to pay Glover to kill the two eyewitnesses if Glover was to be released soon. Gilmore also told Glover that he had been at his uncle's house when one of his uncle's friends, Sergeant Gathers of the Charleston, South Carolina police force, paid a visit. Gathers recognized Gilmore from a "wanted" poster. Gilmore then offered Gathers a $10,000 bribe to forget that he had seen him. Gathers refused the bribe, but, because of his friendship with Gilmore's uncle, allowed Gilmore to surrender voluntarily.

Gilmore denied having ever met Glover, and Glover acknowledged that he had learned about Gilmore's arrest, which had been publicized in the New York City newspapers, before his alleged conversation with Gilmore.

Gilmore attempted to call Sergeant Gathers, a 32–year veteran of the Charleston police force, to testify that he had never been offered a bribe by Gilmore. The trial court sustained the prosecutor's hearsay objection to such testimony. During his summation, the prosecutor bolstered Glover's credibility by referring to Glover's

knowledge of the "fact" of Gilmore's attempted bribe of Gathers.

The district court found that the trial court committed "error of constitutional magnitude" by impeding Gilmore's right to call witnesses. 646 F.Supp. 1528, 1537 (E.D.N.Y.1986). We agree. No other conclusion is possible. As Justice Powell explained in *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), the right "to call witnesses in one's own behalf ha[s] long been recognized as essential to due process." *See also Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). In holding that "the trial court improperly impeded defendant's ability 'to present his own witnesses,'" the Court of Appeals evinced its reliance on these principles as well by its citation to *People v. Carter,* 37 N.Y.2d 234, 240, 371 N.Y.S.2d 905, 333 N.E.2d 177 (1977) (the Sixth Amendment guarantee that the accused be allowed to present witnesses in his defense applies to state proceedings through the due process clause of the Fourteenth Amendment). *People v. Gilmore, supra,* 66 N.Y.2d 863, 867, 498 N.Y.S.2d 752, 754, 489 N.E.2d 721, 723 (1986).

Although finding constitutional error, both the Court of Appeals and the district court concluded that the error was harmless. We disagree.[1] "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It cannot be said here that the prosecution adduced overwhelming evidence against Gilmore. Murdock, the prosecution's prime witness, was himself a suspect and clearly had a motive to fabricate a story. Moreover, as Judge Meyer of the Court of Appeals pointed out in dissent, Murdock's testimony did not ring true. He testified that Gilmore planned to kill both

---

**1.** Accordingly, we do not reach Gilmore's two other claims: that the prosecution concealed its past dismissals of Glover's felony cases in ex-
change for his testimony; and that the prosecution improperly elicited testimony regarding Gilmore's post-arrest silence.

Gross and Sneed. However, Sneed's wounds were caused, not by bullets shot at her, but by fragments of bullets aimed at Gross.

Nor was Sneed's testimony free from doubt. Her recollection that she saw Gilmore bend over and say something about a gun immediately before the shooting is consistent with Gilmore's claim that he tied his shoes and exclaimed "A gun" when he saw Murdock's gun. She conceded that she could not "quite make out" Gilmore's words.

The prosecution relied primarily upon two pieces of evidence to distinguish Gilmore's version of the facts from Murdock's: Gilmore's flight and Glover's testimony about Gilmore's alleged confession. As the trial court charged, flight, at best, is weak evidence of guilt. Glover, a felon and paid informant with a history of cooperation with the district attorney, did not command much credibility. And, it seems unlikely that Gilmore would have made such a confession to only a passing acquaintance in a holding cell. Finally, the prosecution never called Roger Lee—a prisoner who allegedly was with Gilmore and Glover when Gilmore confessed—to bolster Glover's credibility.

Given the equivocal nature of the evidence adduced, the excluded testimony of defense witnesses Drayton and Gathers went to the heart of the case—why the jury should believe that Gilmore fired the shots, instead of Murdock. The exclusion of their testimony cannot be deemed harmless.

The prosecution placed considerable emphasis on Gilmore's flight, raising the issue four times in a thirty-four page summation, and referring to Gilmore's unexplained flight as "the pie a la mode, the cream on the pudding." The court charged the jury on the issue, stating that "unexplained" flight might be indicative of guilt and that any explanation of the accused should be considered in connection with the evidence of flight. As a consequence, the absence of an explanation for the flight from Drayton undoubtedly reinforced its inculpatory impact. The prosecution's claim that Gil-

more was able to introduce the central facts underlying his explanation—that armed police were looking for him and that he was informed of this fact—is spurious. Gilmore's proffered explanation for his flight stemmed from his fear that the police would confront him with armed shotguns, as they had mistakenly done with one of his relatives. By preventing him from introducing evidence that the police were pointing guns at his male relatives, the trial court stripped Gilmore of the factual predicates of his explanation.

The exclusion of Sergeant Gathers' testimony was equally damaging. Glover's testimony provided the only evidence of a motive for Gilmore's action—a drug deal gone wrong. Glover also buttressed the inculpatory effect of Gilmore's flight by relating Gilmore's alleged bribe of Gathers. As Judge Meyer noted, had Sergeant Gathers been able to testify that there never had been any bribe offer and that defendant had surrendered voluntarily within a few hours of arrival in Charleston rather than after being discovered in his relative's home, "the jury may have rejected Glover's triply incriminating story as out of the whole cloth." 66 N.Y.2d at 870, 498 N.Y. S.2d 752, 489 N.E.2d 721. The state's argument, that Gathers' testimony was merely cumulative since Gilmore had already testified that he had not offered Gathers a bribe, ignores the much greater credibility of a witness like Gathers.

Nor can we accept the district court's reasons for concluding that the excluded evidence was harmless. First, the court noted that the excluded evidence did not contradict the testimony of Murdock or Sneed. This misses the point. The excluded evidence dealt with different matters— the reason for Gilmore's flight and the nature of his surrender. Further, Sneed's testimony was not conclusive, and Murdock's testimony was inherently suspect. Second, the court indicated that the circumstances of Gilmore's flight paled when compared to the other inculpatory aspects of his conduct—namely, his failure to contact the police immediately after the shooting. However, Murdock, the only other suspect,

also did not contact the police. And, Gilmore, unlike Murdock, had a good reason not to contact them; Gilmore testified that Murdock had threatened to kill him if he did.

Third, the district court believed that the physical evidence was conclusive. Based on the fact that one of the bullet fragments impacted the front windshield perpendicularly, the court inferred that there was a line of fire leading from the point of impact directly back to the left rear passenger seat, where Gilmore was concededly sitting. It thus concluded that Gilmore must have done the shooting. Yet, the court's reasoning ignores the fact that the bullet which hit the windshield perpendicularly first fragmented when it passed through Gross's skull and so might have been altered in its trajectory. Consequently, the bullet did not necessarily have to originate from a point directly behind the victim's head for one of its fragments to hit the windshield perpendicularly. Moreover, as Judge Meyer observed, this physical evidence was equally consistent with the shooter being right-handed, as defendant was, or left-handed, which Murdock might have been—a possibility which the prosecution failed to disprove. Thus, the district court's acceptance of the conclusiveness of the physical evidence was unwarranted.

In summary, because we believe that the evidence which the trial court excluded was of such importance to the determination of Gilmore's guilt, we cannot conclude that its exclusion was harmless error. Accordingly, the case is remanded with directions to grant the writ of habeas corpus unless Gilmore is retried within a reasonable time.