UNITED STATES of America, Appellee,

v.

Esperanza SAA, Gabriel Saa, Martha Vega, Luis Andrade, Defendants–Appellants.

Nos. 936, 937, 946 and 1098, Dockets 87–1475, 87–1476, 87–1492 and 87–1502.

United States Court of Appeals, Second Circuit.

Argued April 4, 1988.

Decided Sept. 20, 1988.

* Of the Second Circuit, sitting by designation.

Robert L. Herbst, New York City, for defendant-appellant Esperanza Saa.

Mitchell A. Golub, New York City, for defendant-appellant Gabriel Saa.

Louis M. Freeman, New York City (Freeman, Nooter & Ginsberg, New York City, David B. Miller, law student, of counsel), for defendant-appellant Luis Andrade.

Gino Josh Singer, New York City, for defendant-appellant Martha Vega.

J. Gilmore Childers, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Martin Klotz, Aaron R. Marcu, John F. Savarese, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before OAKES and WINTER, Circuit Judges, and CEDARBAUM, District Judge.[*]

CEDARBAUM, District Judge:

Esperanza Saa, Gabriel Saa, Martha Vega and Luis Andrade appeal from judgments of conviction on one count of con-

spiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. The judgments were entered following a jury trial before the United States District Court for the Southern District of New York, John M. Walker, *Judge.* Appellants contend that alibi witnesses were improperly precluded from testifying at the trial, that an informant's identity should have been revealed to them, and that the trial court should not have allowed the Government to argue that an inference unfavorable to the defendants could be drawn from their failure to call the informant as a witness. Although we find that the district court erred in these respects, the errors were harmless and we therefore affirm the convictions of all four defendants.

## BACKGROUND

The evidence, as presented in the Government's case, showed that in March of 1987, a paid confidential informant, referred to during the trial as "Robert," had a conversation with one Eli Tollinchi about purchasing large quantities of cocaine. Tollinchi, who set about finding a supplier of drugs to sell to Robert, met in April with Luis Barona, a co-defendant who pled guilty before trial. In a telephone conversation on Friday, April 24, 1987, Barona told Tollinchi to go to 10 East 67th Street, a largely vacant building in Manhattan, to consummate a deal with Robert. When Tollinchi and Barona met outside 10 East 67th Street, Tollinchi told Barona that the transaction could not go forward that day because Robert, Tollinchi's buyer, had not been able to contact his partner. Barona told Tollinchi that the owners of the cocaine were present and should not be trifled with because they were dangerous. Barona pointed to an orange Chevrolet Nova in which a man and a woman were sitting in the front seat. Defendant Gabriel Saa, who was introduced as the superintendent of 10 East 67th Street, then joined Barona. At Tollinchi's request, Ba-

* Hon. Miriam Goldman Cedarbaum of the United States District Court for the Southern District of New York, sitting by designation.

rona and Gabriel Saa agreed to hold on to the "material" until the following Monday.

On Monday, April 27, Tollinchi met with Gabriel Saa at 10 East 67th Street. They drove together to pick up Robert. On their return to East 67th Street, the same orange Nova was parked outside the building with the same man and woman inside. Gabriel Saa identified them to Tollinchi as the owners of the cocaine. Robert, Gabriel Saa and Tollinchi met with Barona inside the building. Gabriel Saa produced two packages of cocaine. Robert pierced the packages with a knife to test the cocaine and then left, saying that he would return in an hour. Tollinchi and Barona waited in the Saa family apartment on the second floor, where they met defendant Esperanza Saa, Gabriel Saa's wife. After speaking with Robert by telephone, Tollinchi announced that Robert had once again been unable to contact his partner and that the deal could therefore not be done that day. Tollinchi and Barona were then taken to a vacant doctor's office on the first floor. Tollinchi heard footsteps going up and then coming down the stairs, whereupon Gabriel Saa told Tollinchi and Barona that the cocaine had been taken away. Outside the building, Tollinchi saw defendants Luis Andrade and Martha Vega, whom he recognized as the man and woman who had been in the orange Nova. Vega was putting a package inside her large coat. Gabriel Saa told Tollinchi to turn his back because the man and woman did not like to be seen. When Tollinchi turned around again, Andrade and Vega had gone.

Late in the afternoon of the following day, April 28, Robert arrived at 10 East 67th Street with two undercover officers of the New York City Police Department, who were acting as his partners. Barona, Tollinchi and the Saas were already there. Gabriel Saa told the others that he had to go to Queens to pick up the cocaine. He left in a pickup truck and was followed by undercover agents. After a considerable period of searching in Queens, Gabriel Saa found and parked next to the orange Nova. He had a conversation with Andrade while Vega remained in the Nova. After meeting with Gabriel Saa, Andrade and Vega drove to a residence in Queens. When they came out, with Vega wearing a long coat, they drove to Manhattan.

While Gabriel Saa was looking for Andrade and Vega in Queens, Esperanza Saa received telephone calls in the apartment at 10 East 67th Street. She told Tollinchi that the calls were from Gabriel Saa and the owners of the cocaine, who were having trouble finding each other. Later, after Gabriel Saa had returned to East 67th Street from Queens, the Saas received two telephone calls from the owners of the cocaine, who reported that they were nearby in Manhattan. Esperanza Saa and Barona left, telling Tollinchi that they were going to pick up the cocaine.

At about 10:15 p.m., Andrade and Vega arrived at 10 East 67th Street, where they went inside and then left the building. Esperanza Saa announced that the cocaine was upstairs in an apartment on the third floor. Tollinchi, Robert, Barona, Gabriel Saa and the two undercover agents all proceeded to the third floor apartment. When the cocaine could not be located, Gabriel Saa told Barona to ask Esperanza Saa where it was. Either Barona or Esperanza Saa produced two packages wrapped in tape, which were placed on the dining-room table. The two undercover agents then tested the packages by piercing them with knives. According to the testimony of one of the undercover agents, Esperanza Saa provided one of the knives that was used. Another Government witness testified that Esperanza Saa was not present in the third-floor apartment after the arrival of the cocaine.

The undercover agents demanded that the "buyers" be allowed to take the cocaine outside to one of their cars to test it. When Gabriel Saa refused, the two undercover agents and Robert left. All of the defendants, along with Barona and Tollinchi, were arrested shortly afterward. Andrade and Vega were arrested in the orange Nova after driving evasively in Manhattan for several minutes.

Following the Government's case, Gabriel and Esperanza Saa rested without

calling any witnesses. Andrade called his father, who testified that Andrade lived in Brooklyn and was a painter. Andrade's father was precluded from testifying as to Andrade and Vega's whereabouts on April 24 or April 27. Andrade and Vega also called Barona, who testified that he had not seen Andrade or Vega at the time the crime was alleged to have taken place, ant that although there had been talk about a drug transaction, no transaction had occurred.

Robert did not testify at the trial, and his real name was never disclosed. Tollinchi pleaded guilty to the conspiracy charge, cooperated with the Government and testified against the defendants.

## DISCUSSION

### A. *Preclusion of Alibi Testimony*

■■■ On June 9, 1987, approximately one month before the trial began, the United States Attorney's Office sent to counsel for the defendants certain discovery material enclosed with a letter requesting reciprocal discovery. The letter added:

> In addition, in the event your client seeks to interpose an alibi defense or a defense based on mental disease, the Government requests written notice pursuant to Fed. R.Crim.P. 12.1 and 12.2.

The letter did not specify the date, time or place of the offense with which the defendants were charged.

On Sunday, July 5, 1987, two days before the trial began, the Government turned over to the defense an Assistant United States Attorney's notes of an interview with Tollinchi. The interview notes referred to certain times and places relating to the narcotics transaction, and included mention of certain days of the week. The notes did not mention any dates, however.

One week later, on Sunday, July 12, as the prosecution was nearing the end of its case, Andrade's attorney telephoned the Assistant United States Attorney who was prosecuting the case to inform him that Andrade and Vega would call Andrade's father and stepmother as witnesses. According to an offer of proof made by the defendants before Judge Walker the fol-

lowing day, these witnesses would have testified that Andrade and Vega were at Andrade's father's house in Brooklyn in the late afternoon or early evening of April 27. This testimony would have contradicted Tollinchi's testimony placing them at 10 East 67th Street in Manhattan at the same time or shortly before.

Judge Walker precluded the alibi witnesses' testimony. He held that the combination of the Government's June 9 letter and the interview notes was sufficient to satisfy the requirements of Fed.R.Crim.P. 12.1(a), and that the Government had been prejudiced by the defense's failure to give earlier notification of its alibi defense.

Fed.R.Crim.P. 12.1(a) provides:
> Upon written demand of the attorney for the government stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the attorney for the government a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

The Government's June 9 letter did not trigger the notice of alibi requirements of Rule 12.1(a) because it did not specify the time, place and date of the alleged offense. The interview notes in combination with the June 9 letter do not satisfy Rule 12.1(a) because the notes do not specify any dates, and also because the Government did not state in writing that the offense was committed at the times and places referred to in the notes. Furthermore, the Government provided the interview notes only seven days before the defendants informed the Government of their intent to call alibi witnesses, and only eight days before the defendants actually sought to call the witnesses. Rule 12.1(a) gives defendants ten days to comply with a proper Government demand. Therefore the defendants were not in violation of the Rule even if a proper

Government demand had been made as of the time the interview notes were provided to the defendants. For this reason we do not consider the Government's argument, raised for the first time on oral argument of this appeal, that the combination of the interview notes and the indictment satisfied Rule 12.1(a).

■ The Government relies on the Advisory Committee Note to Rule 12.1, which states that *"[t]he initial burden is upon the defendant to raise the defense of alibi,* but he need not specify the details of his alibi defense until the government specifies the time, place, and date of alleged offense."* (emphasis added) Thus, the Government argues, even if the June 9 letter did not require Andrade and Vega to disclose the details of their alibi defense, it at least obligated them to raise it.

The Advisory Committee Note addressed the original text of the proposed Rule as approved by the Supreme Court, which placed the initial burden of raising the defense on the defendant. However, Congress rejected this approach, and changed the language of proposed Rule 12.1 in order to place upon the Government the burden of triggering the duty to disclose an alibi defense. *See* H.R.Rep. No. 94–247, 94th Cong., 1st Sess., 1975, pp. 8–9, *reprinted in* 1975 U.S.Code Cong. & Ad.News 674, 680–81; C. Wright, *Federal Practice & Procedure: Criminal* § 202, at 743 & n. 1 (2d ed. 1982). The Rule as revised and enacted by Congress clearly provides that a defendant need not disclose her intent to offer an alibi defense unless and until the Government submits a written request specifying the time, date and place of the alleged offense. *See United States v. Dupuy,* 760 F.2d 1492, 1499 (9th Cir.1985); *United States v. Bouye,* 688 F.2d 471, 474–75 (7th Cir.1982). It was therefore erroneous for the District Court to preclude the testimony of these two alibi witnesses on

the ground that the defendants had failed to comply with Rule 12.1.[1]

■ The preclusion of the two alibi witnesses deprived Andrade and Vega of their Sixth Amendment right to compulsory process to present the testimony of witnesses in their own defense. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Gilmore v. Henderson,* 825 F.2d 663, 665 (2d Cir.1987). *Cf. Taylor v. Illinois,* —— U.S. ——, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (right to compulsory process not violated by exclusion of defense witness where defendant deliberately violates discovery rules).

**B.** *Refusal to Disclose Identity of Informant*

On the day before the trial began, counsel for Esperanza Saa and Luis Andrade[2] requested in open court that the district judge order disclosure of Robert's identity. The Government stated that it did not intend to call Robert as a witness, and agreed to convey to him the defendants' request that they be permitted to interview him in order possibly to call him to testify for the defense. The Government also promised to make Robert available in the event the defense wished to call him. The defendants renewed their request for Robert's identity several times during the course of the trial. The prosecution opposed disclosing Robert's identity, and contended that since Robert was soon to enter the federal witness protection program, he might be in some danger until that event took place. The Government also informed defense counsel that Robert had conveyed a desire not to be interviewed by them. The district judge declined to order disclosure of Robert's identity, on the ground that defendants had failed to show that disclosure was essential to the defense.

---

**1.** Since the defendants did not violate Rule 12.1, we do not reach the question of whether the district judge abused his discretion by precluding the witnesses from testifying without considering whether a brief continuance would have cured any prejudice to the Government.

**2.** The district judge made clear that applications made by any defendant were deemed also to have been made by the others.

The leading Supreme Court case on this question, *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), holds that

> [w]here the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [informant's] privilege must give way.

353 U.S. at 60–61, 77 S.Ct. at 628. The Court explained that "no fixed rule with respect to disclosure is justifiable." *Id.* at 62, 77 S.Ct. at 628. What is required is "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* Whether non-disclosure is erroneous "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id. See Rugendorf v. United States*, 376 U.S. 528, 534–35, 84 S.Ct. 825, 829, 11 L.Ed.2d 887 (1964); *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir.1983); *United States v. Ortega*, 471 F.2d 1350, 1359 (2d Cir.1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed. 2d 409 (1973).

The defendant is generally able to establish a right to disclosure "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir.1984); *United States v. Roberts*, 388 F.2d 646, 648–49 (2d Cir. 1968); *see United States v. Price*, 783 F.2d 1132 (4th Cir.1986); *United States v. Barnes*, 486 F.2d 776 (8th Cir.1973). In *Roberts*, the informant introduced an undercover agent to the defendant and was present when the defendant and the agent negotiated and transacted two sales of heroin. The Court, noting that the informant was "present during all the significant events," 388 F.2d at 649, found that he was "obviously a crucial witness to the alleged narcotics transactions," *id.*, and therefore, his whereabouts should have been revealed to the defense if properly requested. But disclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 870–71, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982) (dictum); *United States v. Lilla*, 699 F.2d at 105. As this Court's recent opinion in *United States v. Jimenez*, 789 F.2d 167 (2d Cir.1986) makes clear, it is not sufficient to show that the informant was a participant in and witness to the crime charged. In *Jimenez*, the informant was both participant and witness, but the district court's refusal to order disclosure of his identity was upheld on the ground that the defendant had failed to show that the testimony of the informant "would have been of even marginal value to the defendant's case." 789 F.2d at 170.

■ Robert was both a witness to and a participant in many of the events that led to the conviction of these defendants. He was the only agent of the Government present at 10 East 67th Street on Monday, April 27, and he and Tollinchi were the only potential Government witnesses to the happenings of that day. He was at 10 East 67th Street during all of the critical events that took place there on the following day, April 28. Robert's status was similar to that of the informant in *Roberts*. Thus, if his testimony would have been material, his identity should have been revealed to the defense. But the defendants other than Esperanza Saa have made no showing that Robert's potential testimony was material to their defense. Therefore failure to order disclosure was not error as to them. *See Jimenez*, 789 F.2d at 170; *Lilla*, 699 F.2d at 105. As to these defendants, Robert's testimony, for the reasons discussed in the next paragraph, could merely have cast doubt on the general credibility of one of the Government witnesses. "That is normally an insufficient basis to overcome the informant's privilege." *Russotti*, 746 F.2d at 950.

■ Esperanza Saa argued to the district judge that the informant could shed light on an apparent contradiction in the

testimony as to whether she was present in the third-floor apartment on April 28 after the arrival of the cocaine. Detective Jose Franceschi, one of the undercover officers who acted as Robert's partners, testified that Esperanza Saa was present. Officer Felix Marquez, the other undercover agent, testified that she was not present. Detective Franceschi's testimony concerning the events in the third-floor apartment on April 28—in particular, his recollection that Esperanza Saa was present while the others were searching for the cocaine, that she personally found the cocaine and brought it into the dining room, and that she provided a knife for the "buyers" to use in testing the cocaine—constituted strong evidence of Esperanza Saa's participation in the conspiracy. Had Robert testified, as did Marquez, that Esperanza Saa was not present in the third-floor apartment after the cocaine had arrived and that she did not bring the cocaine into the dining room or provide a knife for testing it, the testimony would have been material to her defense. Of course, Esperanza Saa cannot establish that Robert would have testified in this manner, but it suffices that she is able to point to "the events to which [Robert] might testify, and the relevance of those events to the crime charged." *Valenzuela–Bernal*, 458 U.S. at 871, 102 S.Ct. at 3448.

The Government argues that since it had promised to make Robert available in the event the defense called him to testify, the district court's failure to order disclosure of Robert's identity was not error. While it is true that this offer by the Government obviated Esperanza Saa's need for Robert's name for the purpose of subpoenaing him to testify, the offer still left her unable to seek to interview Robert in order to obtain his account of what took place and to determine whether to call him as a witness at all. As the Supreme Court noted in *Roviaro*, "[t]he desirability of calling [the informant] as a witness, *or at least interviewing him in preparation for trial,* was a matter for the accused rather than the Government to decide." 353 U.S. at 64, 77 S.Ct. at 629 (emphasis added). From this language, as well as from the practical reality that a witness with a special relationship with the Government is not truly "available" to the defense merely because he is physically available to be called, *see United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir.1988), stems the right under *Roviaro* to information about an informant not merely so that the defense can call the informant to testify, but so that it can seek to interview him first. *See United States v. Fischel*, 686 F.2d 1082, 1092 n. 11 (5th Cir.1982) ("The desire for a pretrial interview constitutes a justification for disclosing an informant's address even when the government has agreed to produce the informer at trial...."); *United States v. Barnes*, 486 F.2d at 780 (Government obligated to try to locate informant *"for interview by the defendant* and use as a possible witness") (emphasis added); *United States v. Roberts*, 388 F.2d at 649 (district court should have ordered disclosure of informant's whereabouts, if requested by defendants *"in order to interview him* as a potential witness") (emphasis added). As the Fifth Circuit noted in *Fischel*, a witness may decide not to grant an interview to a defendant, "[b]ut it is a different matter for the government to place a defendant at a tactical disadvantage by reserving to itself alone the ability to request an interview with a material witness." 686 F.2d at 1092.

 In this case the Government informed defendants and the district court that Robert did not wish to be interviewed by defendants. In addition, the Government contended without elaborating that Robert, who was about to enter the federal witness protection program, might have been in some danger had his identity been revealed. We believe that having the prosecution pass along to an informant a request by defendants that they be allowed to interview him is no substitute for permitting defense counsel to ask the informant themselves. Nevertheless, if the district judge was persuaded by the Government's assertions that Robert would be in danger if identified, a middle course could have been considered, such as having the Government produce Robert for an *in cam-*

*era* meeting with defense counsel and the court. Such a middle course might have satisfied the defendants' right personally to request an interview with the informant, without jeopardizing the informant's safety. In the absence of any measure such as this, however, as to Esperanza Saa, the district court's failure to order disclosure of Robert's identity was error.[3]

## C. Charge to Jury and Summation Concerning Uncalled Witness

■ During a preliminary discussion concerning the jury charge, the Assistant United States Attorney requested that Judge Walker give a standard instruction concerning equally available uncalled witnesses. One of the defense counsel requested a "missing witness" charge as to "Robert," who was entirely in the Government's control. The prosecutor responded that "Robert" was equally available since the Government had promised to make him available to testify, although Robert was unwilling to be interviewed by defense counsel before testifying.

At the charge conference, defense counsel renewed their objection to the use of an "uncalled witness" instead of a "missing witness" charge with respect to Robert. Defense counsel apparently never submitted the precise language of their proposed instruction. Judge Walker refused to give a missing witness charge as to Robert, and instead gave the standard instruction requested by the Government. The charge stated that both sides have the power to subpoena witnesses, and that if a witness could have been called by either side but was called by neither, "then you may infer that the testimony of the absent witness may have been unfavorable to the

government or to the defendant as the case may be, or to both of them." Judge Walker added that neither side had any obligation to call a witness whose testimony would be merely cumulative. After the charge was given, defense counsel renewed their earlier objection.

In their summations to the jury, counsel for three of the defendants pointed out that the Government had not called Robert as a witness. In his rebuttal, the Assistant United States Attorney said:

> But the defendants do have the subpoena power. The defendants could have called the confidential informant and they didn't. [Objection overruled.] Listen to Judge Walker when he ... gives you what is known as an uncalled witness charge. And he will tell you that you can draw an inference either way; you can draw an inference against the defendants for not calling the confidential informant. [Objections overruled.] Do you think that the confidential informant's testimony would have helped them, ladies and gentlemen?

In addition to their objections during the rebuttal summation, defendants moved for a mistrial at the end of the summation on the ground that the prosecutor's comments were improper. The motion was denied.

*United States v. Torres*, 845 F.2d 1165 (2d Cir.1988), which comprehensively reviewed the law on this subject, is dispositive of defendants' objection to the district court's failure to give a missing witness instruction. In *Torres*, the district judge denied a defense request to give a missing witness instruction with respect to a confidential informant. As in this case, the Government in *Torres* offered to make the

---

**3.** The defendants also requested disclosure of the contents of any statements that Robert had given to Government agents. The Government informed the district court that there was only one such statement, which was in writing. Failure to order disclosure of the statement was not error. Although the *Roviaro* Court included the words "or the contents of his communication" in a sentence discussing the limits of the informant's privilege, 353 U.S. at 60–61, 77 S.Ct. at 628, the Court did not address this issue. Appellants have pointed to no case, and we have found none, holding that this language in *Rovia-*

*ro* provides defendants with a generalized affirmative right, independent of the Government's obligations under the Jencks Act, 18 U.S.C. § 3500, and under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to obtain statements of non-witnesses merely because they happen to be informants. Judge Walker examined the statement for *Brady* purposes and determined that it need not be disclosed. Our independent review of the statement confirms that this determination was correct.

informant available to testify if the defense wished to call him, but in an *in camera* hearing the informant confirmed that he was unwilling to speak with defense counsel before testifying. *Torres* pointed out that "in the context of the evidentiary inference to be drawn from a party's failure to call an available witness, the 'availability' of a witness ... depend[s] ... on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." 845 F.2d at 1170, quoting *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir.1973). Therefore, *Torres* held, the district court erred in not considering the informant's relationship to the Government and his refusal to be interviewed when it determined that the informant was "available" to the defense. 845 F.2d at 1170. Nevertheless, the Court held that even if the informant was as a practical matter unavailable to the defense, the district court's failure to give a missing witness instruction against the Government was not reversible error. Whether to give such an instruction lies in the trial court's discretion, *id.* at 1170–71, and the reviewing court is reluctant to reverse "where a judge refrains from commenting on the inference to be drawn on the facts before the jury and allows counsel instead to argue the inference," *id.* at 1171. In addition, the defendants in *Torres* had not submitted to the district court proposed language for their requested charge, and therefore they were unable to show on appeal that their request accurately reflected the law, as is required to successfully challenge the trial court's denial of a requested instruction. *Id.*

The facts of this case are remarkably similar to those in *Torres*. Judge Walker's charge, like that of the district judge in *Torres*, permitted the jury to draw an inference adverse to the Government from its failure to call Robert as a witness, and Judge Walker permitted defense counsel to argue such an inference in summation. Furthermore, the defendants here, like those in *Torres*, apparently did not submit any proposed language for their requested charge. Therefore, for the reasons stated

in *Torres*, Judge Walker's failure to give a missing witness charge does not constitute reversible error.

■■■ Nevertheless, as in *Torres*, we must also consider whether the district judge erred in permitting the prosecutor to argue in summation that the jury should draw an inference against the defendants for failing to call Robert. *Torres* did not address whether the trial judge in that case erred in permitting such an argument; it merely held that "any error in this respect was harmless." *Id.*

In this case the defendants were not given Robert's name or address. The Government informed the defense that Robert was unwilling to be interviewed. The defendants were not able to contact Robert to ask him personally whether he would be willing to submit to a pre-trial interview. Nor were they able to investigate or inquire through other means as to what he might say if they decided to call him. Thus, if they had called Robert to testify, they would have done so without knowing what he would say. Since Robert was an informant with a special relationship with the Government, from the defense perspective this would have been an enormous and probably an intolerable risk. This, then, was a witness who was clearly "favorably disposed" toward the Government, and one who was not meaningfully "available" as a witness for the defense. *See United States v. Ariza–Ibarra*, 651 F.2d 2, 16 (1st Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). Under these circumstances, it was not appropriate for the trial court to permit the Government to argue that the jury should draw an inference adverse to the defendants from their failure to call Robert as a witness.

### D. *Harmless Error*

#### 1. Andrade, Vega and Gabriel Saa

With respect to most violations of constitutional rights in criminal trials, "if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harm-

less and the verdict may stand." *Satter-white v. Texas*, —— U.S. ——, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988), citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In *Gilmore v. Henderson*, 825 F.2d 663, 665–67 (2d Cir.1987), harmless error analysis was applied to a Sixth Amendment violation resulting from the improper preclusion of alibi witnesses, an error identical to the preclusion of the alibi witnesses of defendants Andrade and Vega in this case.[4] Harmless error analysis is appropriate here, because, although certain Sixth Amendment violations "that pervade the entire proceeding" constitute per se harmful error, *see Satterwhite v. Texas*, 108 S.Ct. at 1797, the violation here concerned only two witnesses. This case therefore resembles *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), in which the Supreme Court held that harmless error analysis applied to the denial of a defendant's right to cross-examine a prosecution witness for bias. Further support for our conclusion is found in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3106–7, 92 L.Ed.2d 460 (1986), in which the Court stated that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." *See also Fendler v. Goldsmith*, 728 F.2d 1181, 1190 (9th Cir.1983) (applying harmless error doctrine, without discussion, to violation of Sixth Amendment right to call witnesses).

■ The trial court's error in barring the two alibi witnesses, while violating Andrade and Vega's right to compulsory process, was harmless. According to appellants, the witnesses would have testified that on April 27th Vega was in Brooklyn at 5:30 p.m. and Andrade arrived there at 6:30 or 7:00 p.m. Tollinchi, the cooperating witness, had placed Andrade and Vega 50 minutes away, at 10 East 67th Street in Manhattan, between approximately 5:00

and 6:00 p.m. Even if the alibi testimony is credited, it only shows that Tollinchi could not remember the time of the meeting, as he repeatedly testified he could not. It does not support a finding that Andrade and Vega were not at 10 East 67th Street on the afternoon of April 27, and does not otherwise impeach Tollinchi's credibility, as claimed by appellants Gabriel and Esperanza Saa.

Even excluding Tollinchi's testimony about April 27, there was sufficient evidence against Andrade and Vega for us to conclude beyond a reasonable doubt that the jury would still have found them guilty. There was testimony, which Andrade's parents would not have contradicted, that Andrade and Vega were in their car in front of 10 East 67th Street on April 24, and that the occupants of the car were identified as the owners of the cocaine. There was also overwhelming evidence which would not have been contradicted that it was Andrade and Vega who brought the cocaine from Queens and delivered it to 10 East 67th Street on April 28. Our conclusion that Andrade and Vega would have been found guilty even if Andrade's father and stepmother had been allowed to testify is not undermined by the effect of the prosecutor's comments in his rebuttal summation asking the jury to draw an adverse inference against the defense for failing to call Robert to testify. Andrade and Vega have not suggested how the testimony of Robert could have been favorable to them. In any event, based on the other evidence against them, we find beyond a reasonable doubt that any adverse inference improperly drawn by the jury would not have tilted the scales from not guilty to guilty.

Permitting the comments in the prosecutor's rebuttal summation was the only error with respect to Gabriel Saa, as to whom the evidence of guilt was powerful. This error was therefore harmless to Gabriel Saa as well.

---

**4.** *Escalera v. Coombe*, 826 F.2d 185, 193 (2d Cir.1987) assumed without deciding that a similar error was subject to harmless error analysis. *Escalera* was vacated by the Supreme

Court, —— U.S. ——, 108 S.Ct. 1004, 98 L.Ed.2d 971 (1988), and the opinion on remand, 852 F.2d 45 (2d Cir.1988), did not address the question.

### 2. Esperanza Saa

 While the question is a closer one, we conclude that the trial judge's refusal to order disclosure of the identity of the confidential informant and his permitting the Government to argue the adverse inference against the defendants in rebuttal summation were also harmless as to Esperanza Saa. The only evidence against Esperanza Saa to which these errors relate is that of her activity in the third-floor apartment after the drugs arrived on April 28—that is, the evidence going to the questions of whether, as Detective Franceschi testified, she brought the cocaine into the dining room of the third-floor apartment on April 28 after the cocaine had been removed from its hiding place, whether she was present when the cocaine was displayed to the buyers, and whether she provided one of the knives used by the undercover agents to test it.

While mounting no challenge to the sufficiency of the evidence against her, Esperanza Saa contends, as she did at trial, that the jury could have found that she was simply a knowledgeable bystander. She argues that she performed roles such as answering the telephone, taking telephone messages and letting people into the building in her capacity as Gabriel Saa's wife and as a member of the household who lived at 10 East 67th Street, and not as a participant in the conspiracy. We agree that such an explanation is consistent with much of the evidence against her. But there were several pieces of uncontradicted evidence that place her role in a more incriminating light. On the evening of April 28, after she received a telephone call from Andrade or Vega, who said they were at 67th Street and Lexington Avenue, she and Barona left to try to find them and bring back the cocaine. Furthermore, after Andrade and Vega had arrived and then left the building, she told the waiting buyers that the cocaine had arrived, and that they should come upstairs. Finally, she played a role in transmitting messages by telephone while Gabriel Saa was trying to locate Andrade and Vega in Queens, and knew where the cocaine was hidden after Andrade and Vega had left 10 East 67th

Street. In view of this evidence of Esperanza Saa's participation in the conspiracy, the jury's conclusion would not have been altered by testimony from Robert that she was not present in the third-floor apartment after the cocaine arrived. *Cf. United States v. Gotay*, 844 F.2d 971, 977 (2d Cir.1988).

We have considered the other arguments raised by appellants, and have found them without merit.

### CONCLUSION

For the reasons discussed above, the appellants' convictions are affirmed.