15-211-cr
United States v. Mustafa

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of October, two thousand eighteen.

PRESENT:   ROBERT D. SACK,
                        REENA RAGGI,
                                   *Circuit Judges*,
                        PAUL G. GARDEPHE,[*]
                                   *District Judge.*

-----------------------------------------------------------------------
UNITED STATES OF AMERICA,

                                                       *Appellee*,

                                 v.                                                                 No. 15-211-cr

MUSTAFA KAMEL MUSTAFA,

                                                       *Defendant-Appellant*,

HAROON RASHID ASWAT, AKA HAROON, AKA HAROON ASWAT, AKA ASWAT HAROON RASHID, OUSSAMA KASSIR, AKA ABU ABDULLAH, AKA ABU KHADIJA, EARNEST JAMES UJAAMA, AKA JAMES UJAAMA, AKA BILAL AHMED, AKA JAMES EARNEST THOMPSON, AKA ABU SUMAYA, AKA ABDUL QAADIR,

                                                       *Defendants*.

-----------------------------------------------------------------------

[*] Judge Paul G. Gardephe, of the United States District Court for the Southern District of New York, sitting by designation.

APPEARING FOR APPELLANT:          SAM A. SCHMIDT, Law Office of Sam A. Schmidt, New York, New York; MICHAEL K. BACHRACH, Law Office of Michael K. Bachrach, New York, New York.

APPEARING FOR APPELLEE:           IAN MCGINLEY, Assistant United States Attorney (Karl Metzner, Assistant United States Attorney, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, New York.

Appeal from a final judgment of the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment entered on January 12, 2015, is AFFIRMED in all respects except as to Counts Seven and Eight, which are REVERSED.

Defendant Mustafa Kamel Mustafa stands convicted after a jury trial of conspiratorial and/or substantive crimes relating to terrorism, specifically, hostage taking, *see* 18 U.S.C. § 1203 (Counts One and Two); providing material support for terrorism, *see id.* §§ 371, 2339A (Counts Three, Four, Seven, and Eight); providing material support to a designated foreign terrorist organization, *i.e.*, al Qaeda, *see id.* § 2339B(a)(1) (Counts Five, Six, Nine, and Ten); and supplying goods and services to the Taliban, *see id.* § 371; 50 U.S.C. § 1705(b); 31 C.F.R. §§ 545.204, 545.206(b) (Count Eleven). We assume the parties' familiarity with the facts and record of prior proceedings, which we reference only as necessary to explain our decision to affirm conviction on all counts except Counts Seven and Eight.

I.     Sufficiency of the Evidence: Counts Three through Eleven

A defendant challenging the sufficiency of the evidence supporting his conviction bears a "heavy burden," *United States v. Lee*, 834 F.3d 145, 152 (2d Cir. 2016), because although we review such a challenge *de novo*, *see United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), we must affirm if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord Musacchio v. United States*, 136 S. Ct. 709, 715 (2016).

A.     Counts Three through Six: Terrorist Training

Mustafa argues that evidence showing that he sent co-defendants Oussama Kassir and Haroon Aswat to the United States in 1999 to provide terrorist training was insufficient to support his material support convictions on Counts Three through Six because the evidence admitted an inference only that Mustafa wished to provide Muslims with a means to fulfill their religious duty to train for jihad, not that he knew they would use, or intended for them to use, that training to commit or aid violations of 18 U.S.C. § 956(a) (prohibiting conspiracy within United States to murder, kidnap, maim, or injure persons, outside United States), *see* 18 U.S.C. § 2339A, or to support al Qaeda, *see id.* § 2339B.

Even a sampling of the evidence defeats the argument.  It showed that Mustafa himself stated that "why we are running camps" is to train Muslims to fight on "the front lines."  GX 106, 107.  That the contemplated front-line fighting referenced acts of

3

terrorism violative of § 956(a) was evident from both Mustafa's words and deeds. He repeatedly told followers that it was appropriate to kill *kaffirs, i.e.*, non-Muslims, "even if there's no reason for it." GX 132. Indeed, in late 1998, Mustafa aided and abetted the terrorist Islamic Army of Aden in its kidnapping of 16 non-Muslim tourists in Yemen—two of them Americans—in an effort to compel the Yemeni government to release certain of Mustafa's followers from custody. Four of the hostages were killed in the endeavor.[1] Moreover, a jury could reasonably infer that in pursuing the training scheme, Mustafa's intent was to provide material support not only for terrorist acts, but for al Qaeda specifically. Evidence showed Mustafa photographed with and praising al Qaeda leader Osama bin Laden, an infamous proponent of Islamic terrorism. Indeed, Mustafa spoke approvingly of al Qaeda's murderous attacks on the World Trade Center and the USS *Cole*. He possessed a copy of bin Laden's 1996 declaration of war against the United States, as did his co-conspirator Kassir, who in fact had it with him in the United States while pursuing the training scheme at issue in Counts Three through Six. Moreover, when Mustafa sent follower Feroz Abbasi to Afghanistan for training in 2000, he sent him to a camp that produced al Qaeda fighters (including Richard Reid and Zacharias Moussaoui) and that was run by Ibn Sheikh al Liby, who led al Qaeda forces against United States troops at the 2001 Battle of Tora Bora in Afghanistan.

---

[1] This conduct is the basis for Mustafa's convictions on Counts One and Two, to which he mounts no sufficiency challenge. But the evidence was also probative of his intent in providing the training at issue in Counts Three through Six.

While Mustafa attempts to cast this evidence—and much more—in a benign light, the jury was by no means required to take that view, nor is this court in reviewing the sufficiency of the evidence. *See United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (holding that "task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court" evaluating challenge to sufficiency of evidence). Because a reasonable jury could conclude that Mustafa and his co-defendants set up a training camp for jihad fighters in the United States in order to provide material support for terrorism and, specifically, for the terrorist organization al Qaeda, his sufficiency challenge to Counts Three through Six fails on the merits.

B.      Counts Seven through Ten: Sending Abbasi to Afghanistan

In challenging his material support convictions for sending Abbasi from London to an al Qaeda training camp in Afghanistan in 2000, Mustafa repeats his Count Three to Six argument that the evidence shows only his intent to help Muslims fulfill a religious obligation, not to support terrorist acts or al Qaeda. We reject that argument for the reasons just stated.

1.      Jurisdictional Nexus to the United States: Counts Nine and Ten

On Counts Seven through Ten, Mustafa also challenges the sufficiency of the evidence to demonstrate a jurisdictional nexus to the United States. *See generally Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (stating presumption that United States laws operate domestically absent contrary congressional action); *United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (holding presumption applicable to federal

5

criminal law). The challenge fails as to Mustafa's Counts Nine and Ten convictions for providing material support to al Qaeda in violation of 18 U.S.C. § 2339B because, since 1996, Congress has expressly provided for that statute's extraterritorial application. *See* Antiterrorist and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 303, 110 Stat. 1214, 1250–53; *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (recognizing Congress's "authority to enforce its laws beyond the territorial boundaries of the United States"); *see also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016) (holding that criminal RICO can apply extraterritorially to extent particular predicate offenses themselves apply extraterritorially).

2.    Jurisdictional Nexus to the United States: Counts Seven and Eight

In reviewing Mustafa's nexus challenge to his Counts Seven (conspiracy) and Eight (substantive) convictions, we deal with two different iterations of the relevant statute. As originally enacted, 18 U.S.C. § 2339A did not provide for extraterritorial jurisdiction. To the contrary, it stated that, "[w]hoever, *within the United States*," provided or concealed material support knowing it would be used in preparation for or in carrying out certain specified violations of United States law, could be imprisoned for up to ten years. 18 U.S.C. § 2339A(a) (1996) (emphasis added). The highlighted language makes plain Congress's intent for "the conduct relevant to the statute's focus," *i.e.*, the provision or concealment of material support, to have "occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. at 2101 (holding that "[i]f the conduct relevant to the

6

statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad").

In the aftermath of the 9/11 terrorist attacks on this country, Congress amended § 2339A to expand the statute's territorial reach by deleting the quoted phrase "within the United States," effective October 26, 2001. *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, §§ 805(a)(1), 811(f), 115 Stat. 272, 377–78, 381–82 (codified at 18 U.S.C. § 2339A(a) (2001)). As amended, the statute also criminalized attempts and conspiracies to provide material support, and expanded the specified underlying crimes.

We review Mustafa's Count Seven challenge by reference to the amended statute because only upon amendment did § 2339A criminalize conspiracies to provide material support. We review Mustafa's Count Eight challenge by reference to the original statute because, insofar as Mustafa supplied material support by transporting Abbasi to Afghanistan so that he could train and fight with terrorist groups, the record evidence indicates the completion of this substantive conduct in or about November 2000, well before § 2339A's amendment.

a. <u>Count Eight: Substantive Material Support for Terrorism</u>

To convict Mustafa of substantive material support under pre-amendment § 2339A, the government had to prove conduct "within the United States." The government failed to carry this burden. Evidence that Mustafa, in London, arranged for Abbasi to be transported from London to Afghanistan, could not satisfy the statute's nexus requirement

7

because no part of that conduct occurred within the United States. Similarly, to the extent Mustafa concealed or disguised his support for terrorism by financing Abbasi's travel through a fund in the name of London's Finsbury Park Mosque, that conduct also occurred wholly outside the United States.

The government points to evidence that, some months before Mustafa used the mosque's "hijrah fund" to transport Abbasi to Afghanistan, co-conspirator Ujaama traveled to the United States to raise money for that fund. Ujaama testified that when he made this June 2000 trip, he knew that Mustafa intended for Muslims to make hijrah, *i.e*., migration, to Afghanistan to fight with terrorists on the front lines. We need not here decide whether raising money within the United States that is then used to finance material support for terrorism abroad satisfies the nexus requirement of pre-amendment § 2339A because that is not this case.[2] Although the indictment alleged that money collected by Ujaama in New York "was added to the Finsbury Park Mosque's hijrah fund," App'x 76, S2 Ind. ¶ 29.a, at trial, Ujaama testified that he could not remember whether he deposited any part of the approximately $100 that he raised in the United States into the mosque's hijrah fund. In short, there is no evidence here that any money raised in the United States supported the substantive § 2339A crime charged in Count Eight.

---

[2] Both as originally enacted and as amended, the term "material support or resources" has been defined expansively to include "currency . . . , financial services, . . . personnel, [and] transportation." 18 U.S.C. § 2339A(b).

Accordingly, because the government failed to adduce evidence sufficient to satisfy the nexus requirement of pre-amendment § 2339A, Mustafa's conviction on Count Eight must be reversed.[3]

b. Count Seven: Conspiracy To Provide Material Support

At the same time Congress amended § 2339A to reach inchoate as well as substantive material support crimes, it deleted language requiring that the material support

---

[3] In a single, final paragraph addressing Mustafa's nexus challenge to Counts Seven and Eight, the government suggests that the presumption against extraterritorial application of United States law is overcome here by the nation's "interests in defending itself against violent jihad and al Qaeda." Appellee Br. at 48. We are not persuaded.

First, the nexus requirement of pre-amendment § 2339A is not simply presumptive; it is textual. Further, as already explained, Congress has criminalized the provision of material support to designated terrorist organizations such as al Qaeda in § 2339B, expressly providing for that statute's extraterritorial application. Section 2339A proscribes material support not to designated organizations but in preparation for or in carrying out specified crimes. Thus, when a § 2339A violation supports al Qaeda, that is coincidental, rather than elemental.

The government cites us to precedent recognizing the extraterritorial reach of "statutes prohibiting crimes *against the United States government*," *United States v. Vilar*, 729 F.3d at 73 (emphasis in original) (brackets and internal quotation marks omitted), or against United States personnel acting in their official capacities, even without an express statement of congressional intent, *see United States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012). We need not here decide whether, prior to amendment, § 2339A might apply extraterritorially where the specified underlying crime, by its nature, targets the United States government or its personnel. *See, e.g.*, 18 U.S.C. § 81 (criminalizing arsons pertaining to, *inter alia*, "military or naval stores" and "munitions of war"); *see generally RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. at 2102 (holding that criminal RICO statute can apply extraterritorially when alleged predicate acts apply extraterritorially). That is not this case. The specified underlying statute for Count Eight is 18 U.S.C. § 956, which criminalizes conduct not against the United States, but against individuals of any nationality and property abroad "if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy." *Id.* §956(a)(1), (b).

9

be provided "within the United States." This suggests Congress's intent to afford the amended statute extraterritorial reach. We need not here decide the precise extent of that reach, however, because, even if we were to resolve Mustafa's nexus challenge to his Count Seven conviction in favor of the government, a different sufficiency error requires reversal, specifically, the government's failure to prove commission of the charged conspiracy after § 2339A's October 26, 2001 amendment.

At the outset, we note that the conspiracy charged in Count Seven is alleged to have operated between approximately June 2000 (before § 2339A's amendment) and December 19, 2001 (approximately six weeks after amendment). Mustafa did not raise any sufficiency challenge to the government's post-amendment proof of conspiracy in the district court and, indeed, did so on appeal only in response to an inquiry from this court. Now, however, he argues that the government failed to prove not only that the charged conspiracy existed after October 26, 2001, but also that a conspirator committed at least one post-amendment overt act in furtherance of the scheme. He maintains that review of this unpreserved argument is not limited to plain error, *see United States v. Marcus*, 560 U.S. 258, 262 (2010), because the government waived any challenge to a § 2339A overt act requirement by its request for an overt act charge.

Mustafa's waiver argument fails. Whether § 2339A requires proof of an overt act presents a question of law not controlled by a party's concession. *See United States v. Castillo*, 896 F.3d 141, 149 & n.25 (2d Cir. 2018) (collecting cases). The rule for identifying which conspiracy statutes require proof of an overt act is clearly established by

10

precedent: "a text modeled on 18 U.S.C. § 371 . . . gets an overt-act requirement; . . . a text modeled on the Sherman Act, 15 U.S.C. § 1 . . . dispenses with such a requirement." *Whitfield v. United States*, 543 U.S. 209, 214 (2005) (internal quotation marks omitted). Applying that test here, the text of § 2339A requires no proof of an overt act. *See United States v. Sattar,* 314 F. Supp. 2d 279, 306–07 (S.D.N.Y. 2004) (observing that "conspiracy provision to § 2339A . . . does not have § 371's overt act requirement"), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). Accordingly, Mustafa's timeliness challenge to the sufficiency of proof on Count Seven is limited to the existence of the conspiracy, and our standard of review is plain error.

Precedent clearly establishes that where, as here, a statute is amended to criminalize activity not previously proscribed, the government must prove commission of the crime after the date of amendment to avoid running afoul of the Ex Post Facto Clause. *See United States v. Harris*, 79 F.3d 223, 228–29 (2d Cir. 1996) (citing U.S. Const. art. I, § 9, cl. 3). Here, the government failed to carry this burden. The determinative question is "whether it was possible for the jury, following the district court's instructions, to convict [the defendant] *exclusively* on" pre-enactment conduct. *Id.* at 229 (emphasis in original). The record here indicates that a conviction on that basis was not only possible; it was likely.

That is because the district court did not instruct the jury that it had to find the conspiracy to have existed after October 26, 2001. To be sure, no party requested such an instruction, but the omission itself was plain error in light of *Harris*. A jury, lacking that instruction, would have had no reason to focus its attention on the period after October

11

26, 2001. Indeed, it would have been unlikely to do so given extensive evidence of the conspirators' actions—all in 2000—to arrange for and finance Abbasi's travel to Afghanistan and, upon his arrival there, to deliver him to a terrorist training camp. Evidence of Abbasi's continued actions supporting terrorism might have allowed a properly instructed jury to conclude that the conspiracy continued into 2001. But, absent instruction, the jury would have had no reason to think it had to look beyond the events of 2000 to convict Mustafa on Count Seven.

The government argues that even if these concerns satisfy the first two prongs of plain error review, *United States v. Marcus*, 560 U.S. at 262 (holding that plain error requires showing of (1) error that (2) "is clear or obvious," (3) affects defendant's "substantial rights," and (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings" (brackets and internal quotation marks omitted)), Mustafa cannot demonstrate the requisite injury to substantial rights because "ample evidence" showed that the conspiracy continued after § 2339A's October 26, 2001 amendment. Gov't Letter, Sept. 17, 2018, p. 4.[4] In fact, the evidence is neither as ample nor as clear as the

---

[4] The government does not argue that pre-amendment proof of an agreement among Mustafa and others to provide Abbasi as material support for terrorism gives rise to a presumption that a criminal conspiracy existed after amendment. We have applied a presumption of continuity to conspiracies challenged on statute of limitations grounds. *See, e.g., United States v. Spero*, 331 F.3d 57, 61–62 (2d Cir. 2003). There, however, the law made the charged agreement a crime both before and after the relevant limitations date; the only question was the timeliness of the charge. By contrast, the charged agreement to provide Abbasi as support for terrorism was not a crime—at least not a § 2339A crime— before October 26, 2001. Thus, there was no pre-amendment crime to which a post-amendment presumption of continuity would attach. We do not pursue the point further, however, because the government does not press it here.

12

government suggests. While evidence shows that sometime after September 11, 2001, Abbasi helped guard an al Qaeda Matar training complex in Afghanistan, no evidence confirms that he did so after October 26, 2001, rather than before. In sum, far from there being ample evidence proving the charged conspiracy's existence in the six-week window between § 2339A's amendment and Abbasi's capture,[5] there is no evidence supporting such a finding.

A conviction obtained in the absence of such proof is plain error. Accordingly, Mustafa's conviction on Count Seven, as well as Count Eight, is reversed.

C.      Count Eleven: Conspiracy To Supply Goods and Services to the Taliban

Mustafa argues that evidence that he directed Ujaama to deliver envelopes of cash as well as Abbasi to persons in Afghanistan was insufficient to support his Count Eleven conviction for supplying goods and services to the Taliban in violation of the International Emergency Economic Powers Act ("IEEPA"). *See* 18 U.S.C. § 371; 50 U.S.C. § 1705(b); 31 C.F.R. §§ 545.204, 545.206(b). Mustafa maintains that the money he sent benefitted only widows and orphans, not the Taliban. The argument fails because the relevant implementing regulation, 31 C.F.R. § 545.204, prohibits supplying goods or services not only to Taliban members but to any person in "the territory of Afghanistan controlled by

_____

[5] Abbasi was apparently captured by Afghan forces on an unspecified date and then turned over to the American military in December 2001. While arrest does not necessarily terminate a conspiracy whose existence has been established, *see, e.g.*, *United States v. Agueci*, 310 F.2d 817, 839 (2d Cir. 1962), here no evidence established the existence of the charged conspiracy after October 26, 2001, but before capture.

the Taliban." Because Mustafa's actions were so directed, we reject his sufficiency challenge to Count Eleven.

In sum, we conclude that Mustafa's sufficiency challenges are meritless except as to Counts Seven and Eight.

II.      Prosecution Witness Evan Kohlmann

Mustafa argues that various district court errors pertaining to prosecution witness Evan Kohlmann require vacatur.

A.      Kohlmann's Dual Role as an Expert and a Fact Witness

Mustafa faults the district court for allowing Kohlmann to testify as both an expert regarding al Qaeda's history, structure, and methods, and as a fact witness regarding his 2002 interview of Mustafa. While district courts play a "gatekeeping" role in ensuring that expert testimony satisfies the requirements of Fed. R. Evid. 702, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993), we accord them considerable discretion in doing so and will not disturb a ruling respecting expert testimony absent manifest error, *see United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011), which is not evident here.

Mustafa's methodology challenge to Kohlmann's expert testimony is defeated by precedent, which recognizes that his work has undergone "'various forms of peer review,'" that his opinions are "'generally accepted within the relevant community,'" and that his methodology is "'similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations.'" *United States v. Farhane*, 634

14

F.3d at 159 (quoting *United States v. Sabir*, No. S4 05 Cr. 673(LAP), 2007 WL 1373184, at *8 (S.D.N.Y. May 10, 2007)); *see United States v. Paracha*, No. 03 Cr. 1197(SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006) (same), *aff'd*, 313 F. App'x 347 (2d Cir. 2008).

The same precedent defeats Mustafa's argument that a New York jury required no expert testimony regarding al Qaeda. *See United States v. Farhane*, 634 F.3d at 159 (holding that rationale for admitting expert testimony regarding organized crime families "[d]espite the prevalence of organized crime stories in the news and popular media" "applies with equal force to terrorist organizations, including al Qaeda" (alteration in original)).

As for Mustafa's relevancy challenge to Kohlmann's expert testimony, we review a district court's determination of relevancy for abuse of discretion and identify none here. *See United States v. Schultz*, 333 F.3d 393, 415 (2d Cir. 2003). In urging otherwise, Mustafa cites district court cases that are neither controlling nor analogous. In *United States v. Paracha*, the reason Kohlmann was not permitted to testify about co-conspirators' activities was not that such evidence was irrelevant but, rather, that it was properly presented through fact witnesses. *See* 2006 WL 12768, at *18. In *United States v. Amawi*, 541 F. Supp. 2d 945 (N.D. Ohio 2008), *aff'd*, 695 F.3d 457 (6th Cir. 2012),

15

background evidence as to al Qaeda was not admitted because the defendant—by contrast to Mustafa—was not charged with any conspiracy to aid al Qaeda, *see id.* at 947, 950.

Nor do we identify error in the district court's determination that Kohlmann's testimony was more probative than prejudicial. *See* Fed. R. Evid. 403. The district court acknowledged the inherently inflammatory nature of testimony concerning al Qaeda terror attacks, but carefully balanced potential prejudice against the evidence's relevance to Mustafa's intent in taking actions related to the charged crimes. When we review a district court's Rule 403 assessment of challenged evidence, we "generally maximize [the evidence's] probative value and minimize its prejudicial effect." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (internal quotation marks omitted). Upon doing that here, we identify no abuse of discretion, particularly as the al Qaeda actions testified to by Kohlmann were no more inflammatory than the charged crimes. *See id.* at 133; *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009).

Mustafa urges a different conclusion because Kohlmann testified as both an expert and a fact witness. We have recognized the risks inherent in that circumstance. *See United States v. Mejia*, 545 F.3d 179, 191–92 (2d Cir. 2008). Nevertheless, we have not categorically prohibited it. *See id.*; *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003). Rather, we have urged district courts to be "vigilant gatekeepers," *United States v. Dukagjini*, 326 F.3d at 56, to ensure that "the expert does not usurp either the role of the judge in instructing on the law, or the role of the jury in applying the law to the facts before it," *United States v. Locascio*, 6 F.3d 924, 939 (2d Cir. 1993). The district court ably

16

fulfilled that role here through instructions that made clear when Kohlmann was offering expert opinion and when he was testifying to observed facts. Thus, even if it were appropriate to view Kohlmann as the equivalent of a law enforcement witness—a matter we need not decide—the district court's instructions, together with the inherently distinct nature and subject matter of Kohlmann's expert and fact testimony, satisfactorily safeguarded against juror confusion and, thus, no relief from judgment is warranted.

### B. Limit on Cross-Examination

Mustafa argues that the district court violated his Sixth Amendment right to confrontation, *see* U.S. Const. amend VI, by not permitting him to cross-examine Kohlmann about certain classified information that, Mustafa maintains, would have exposed Kohlmann's bias in favor of the prosecution.[6] Although the Supreme Court has "recognized that the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974), it affords trial judges "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things . . . interrogation that is repetitive or only marginally relevant," *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *accord Michigan v. Lucas*, 500 U.S. 145, 149 (1991). Thus, we review a district court's

---

[6] The court has reviewed the classified information referenced on this appeal and heard argument, in closed session, on such information. We do not seal any part of our decision because we make no reference herein to the content of the classified information.

17

limitations on defense cross-examination for abuse of discretion. *See United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003).

We identify no such abuse here because the jury heard through both direct- and cross-examination that the government was paying Kohlmann $400 an hour for his work in this case and had paid him approximately $1.4 million for his work in other matters. It heard that this remuneration accounted for nearly 40% of Kohlmann's income and that his work for the government went beyond consulting and serving as an expert witness. Such evidence demonstrated that Kohlmann was no newly identified fact or expert witness testifying for the first time for the prosecution. Rather, it convincingly showed that he had a long-standing association with the government and a strong pecuniary motive in its favor. In these circumstances, even if the classified information would also have shown motive and bias, the district court reasonably concluded that further examination on the matter would have been only "marginally relevant" and essentially "repetitive." *Delaware v. Van Arsdall*, 475 U.S. at 679; *see United States v. Damblu*, 134 F.3d 490, 494 (2d Cir. 1998). In urging otherwise, Mustafa points to the different nature of the classified information. The point merits little discussion. Where, as here, a jury learns that a witness has worked for the government in other capacities than as a fact and expert witness and has been paid almost a million-and-a-half dollars, there is no need for it to hear more to understand the witness's bias and motive. *See generally Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir. 2003) (observing that where evidence "merely furnishes an additional basis" to challenge witness whose credibility has already been called into question,

examination may be cumulative); *cf. United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993) (holding that new evidence merely discrediting government witness, but not contradicting government case, ordinarily does not warrant new trial).

C.      Denied Post-Trial Discovery

Mustafa argues that the district court erred in denying him post-trial discovery of other cases in which Kohlmann had testified as a government witness.   Mustafa had sought such discovery so that his counsel could question prosecutors in those cases as to whether Kohlmann had revealed the above-mentioned classified information to them. Mustafa theorized that Kohlmann had not done so and, thus, had perjured himself in testifying that he had at Mustafa's trial.

"We review a district court's denial of a post-trial Rule 33 hearing or discovery for abuse of discretion," and we identify none here.   *United States v. Forbes*, 790 F.3d 403, 411 (2d Cir. 2015).   The district court itself examined Kohlmann about his disclosures to previous prosecutors and deemed his denial of concealment credible.   Mustafa fails to show that this assessment was unreasonable, *see generally United States v. Oguns*, 921 F.2d 442, 448 (2d Cir. 1990) (deferring to district judge's ability to evaluate credibility of law enforcement witness), and identifies no support for his perjury hypothesis.   Indeed, the fact that the same classified information was at issue in *United States v. Abu Ghayth*, No. S14 98 Cr. 1023(LAK) (S.D.N.Y.), seems to belie the hypothesis.   Accordingly, in

19

the absence of any evidence to support Mustafa's speculation as to perjury, the district court acted within its discretion in denying post-trial discovery.

III.     Challenges to Evidentiary Rulings on the Prosecution Case

Mustafa faults the district court for allowing the prosecution to introduce irrelevant and prejudicial evidence, some of which served only the improper purpose of propensity. *See* Fed. R. Evid. 401, 403, 404(b).   We review challenged evidentiary rulings for abuse of discretion, *see Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997) (applying standard to Rule 403 determination); *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (same re: Rule 404(b)); *United States v. Schultz*, 333 F.3d at 415 (same re: Rule 401), which we will not identify absent a showing that the ruling was "arbitrary and irrational," *United States v. Mercado*, 573 F.3d at 141.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (internal quotation marks omitted).   Evidence need not be contemporaneous to the charged crimes to be relevant.   *See United States v. Farhane*, 634 F.3d at 144 (upholding admission of evidence that defendant preached jihad and support for Osama bin Laden several years prior to charged conspiracy to provide material support for al Qaeda); *United States v. Abu-Jihaad*, 630 F.3d at 132 (same, regarding evidence of conversations more than four years after charged crime).   Nevertheless, district courts must balance even relevant evidence's probative value against the risk of unfair prejudice in deciding

20

admissibility. *See United States v. Al-Moayad*, 545 F.3d 139, 159 (2d Cir. 2008). Under our "inclusionary approach" to Rule 404(b), evidence of uncharged crimes or other bad acts is "admissible for any purpose other than to show the defendant's criminal propensity," *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted); *see Huddleston v. United States*, 485 U.S. 681, 691–92 (1988), specifically, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b). Applying these principles here, we identify no abuse of discretion in the district court's rulings as to prosecution evidence.

First, audio and video recordings of Mustafa encouraging religious violence, justifying the kidnapping and enslavement of non-Muslims, praising Osama bin Laden, and applauding murderous al Qaeda attacks in and outside the United States were probative of Mustafa's culpable intent in engaging in the charged crimes. *See United States v. Farhane*, 634 F.3d at 144; *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) (upholding admission of defendant's speeches and writings advocating violent jihad as relevant to *mens rea* element of charged conspiracy). After carefully reviewing each recording, the district court issued a thorough and thoughtful opinion rejecting Mustafa's Rule 401, 403, and 404(b) challenges to this evidence. *See United States v. Mostafa*, 16 F. Supp. 3d 236, 248–68 (S.D.N.Y. 2014). For the reasons stated by the district court, and in light of its repeated instructions properly limiting the jury's consideration of the evidence to *mens rea*, we identify no abuse of discretion in its decision to admit the recordings. *See United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) (presuming jury

followed limiting instruction that 404(b) evidence could not be used for purpose other than establishing defendant's knowledge and intent).

Second, evidence of terrorist literature and military equipment seized from Mustafa's London residence and the Finsbury Park Mosque that he led was also probative of Mustafa's intent to support terrorism and to do so through violence. Mustafa's argument that others had access to the locations where this evidence was stored goes to the weight of the evidence, not its admissibility. *See United States v. Schultz*, 333 F.3d at 416 ("[F]actors which make evidence less than conclusive affect only weight, not admissibility.").

Third, Mustafa challenges the admission of terrorist literature and photographs of terrorist attacks seized from co-conspirator Kassir's Swedish residence in 2003 and 2006. When this evidence was admitted at Kassir's own 2008 trial to show his motive, intent, and knowledge for, among other crimes, the same training camp conspiracy charged against Mustafa, *see United States v. Kassir*, No. 04 CR 356(JFK), 2009 WL 976821, at *6 (S.D.N.Y. Apr. 9, 2009), we affirmed, recognizing the evidence to be "highly probative of Kassir's state of mind," *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011). Mustafa, however, argues that Rule 404(b) does not permit uncharged bad act evidence by a third party to be admitted against a defendant. In support, he cites *United States v. Blum*, 62 F.3d 63 (2d Cir. 1995). But *Blum* holds that a defendant may offer third-party 404(b) evidence to exculpate himself. *See id.* at 68. It does not hold that the government is prohibited from offering such evidence against a defendant. Indeed, because conspiracy

22

requires a meeting of conspirators' minds on a common criminal objective, *see United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008), other-act evidence indicating a co-conspirator's state of mind may well be relevant "to explain how a criminal enterprise developed," "to help the jury understand the basis for the co-conspirators' relationship of mutual trust," *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996), or "to complete the story" of the charged conspiracy, *United States v. Gonzalez,* 110 F.3d 936, 942 (2d Cir. 1997). Here, the fact that both Mustafa and Kassir possessed material supportive of terrorists and terrorist acts made more probable that the object of their training agreement was to provide material support for terrorism and for al Qaeda. *See* Fed. R. Evid. 401. In admitting 404(b) evidence of any kind a district court must still assess the probative value of the evidence relative to its risk of prejudice. But where, as here, the 404(b) evidence found in Kassir's possession was comparable to that in Mustafa's possession, we identify no unfair prejudice concern and, therefore, no abuse of discretion in the district court's decision to admit items seized from Kassir's residence.

Fourth, Mustafa's challenges to evidence seized from, or concerning, other co-conspirators are equally meritless. The compact disk containing letters praising Mustafa and bin Laden, which Kassir gave to co-conspirator Semi Osman when the two were at the Bly camp, was evidence of the charged conspiracy and probative of the relationship of trust among its members, particularly in their support for terrorism as conducted by al Qaeda. *See United States v. Pipola,* 83 F.3d at 566. The guns seized from Osman and from the Dar us Salaam Mosque in Seattle, Washington (where Kassir and Aswat conducted further

23

jihad training after leaving Bly) were similarly probative of the training-camp conspirators' common objective to provide trained fighters as material support for terrorists. Evidence that sometime after Aswat trained at the Bly camp at Mustafa's direction, his name was discovered in the ledger of an al Qaeda safehouse in Pakistan was also relevant in showing that the training-camp conspirators' intent was to provide material support not only for terrorists generally but for al Qaeda specifically. *See United States v. Farhane*, 624 F.3d at 144.

In sum, the challenged evidentiary rulings on the prosecution case were all well within the district court's discretion.

IV.  Challenges to Evidentiary Rulings on the Defense Case

Mustafa, who testified in his own defense, contends that the district court erred in limiting his direct examination and in failing to limit the government's cross-examination.

A.  Direct Examination

Mustafa faults the district court for not permitting him to testify to years of solitary confinement, which he submits was necessary to explain his poor memory and articulation at trial and to undermine any government argument that his testimony was calculated because he was an experienced orator. The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking jury sympathy. Accordingly, it allowed Mustafa to testify only that (1) he had not spoken to more than one person at a time over ten years of confinement, and (2) such confinement adversely affected his memory. This was a reasonable compromise of competing

24

interests falling well within the district court's discretion. That Mustafa was not prejudiced by the compromise is evident from his and his counsel's statements to the district court that anticipated memory and articulation problems were not, in fact, impeding his trial testimony, a fact confirmed by the court's own observations.

Mustafa further argues that he should have been allowed to testify to his cooperation with British law enforcement and intelligence agencies, which was relevant to explaining that some of his words and actions seemingly supportive of terrorism were, in fact, intended only to exert a calming influence on radical elements within the Finsbury Park Mosque community. Mustafa submits that this, in turn, would have supported his assertion that, in the charged Yemeni hostage conspiracy, he acted as an intermediary intent only on brokering a peaceful resolution, not as a supporter of terrorist actions. The argument fails because Mustafa does not claim to have been working for British authorities in dealing with the Yemeni hostage situation. This court has previously upheld a district court's decision to exclude testimony of a defendant's cooperation with intelligence authorities that had "no bearing on the crimes charged," or risked "confusing the jury with extraneous matters." *United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997). Moreover, the Rules of Evidence and our precedent clearly prohibit "good acts" evidence to demonstrate a defendant's propensity not to engage in charged crimes. *See United States v. Quattrone*, 441 F.3d 153, 191–92 (2d Cir. 2006); Fed. R. Evid. 404(b), 405.

*Gilmore v. Henderson*, 825 F.2d 663 (2d Cir. 1987), cited by Mustafa, warrants no different conclusion. There, we reversed a state conviction where the prosecution argued

25

that the defendant's flight evidenced consciousness of guilt, but the trial court had prohibited the defendant from explaining that he fled for fear of the police, who had earlier confronted his family with shotguns. *See id.* at 666. In short, the excluded testimony in *Gilmore* bore directly on a contested issue probative of the defendant's guilt on the charged crime. By contrast, the precluded testimony here was removed from, if not completely irrelevant to, Mustafa's guilt in the charged hostage taking crimes. The district court did not abuse its discretion in excluding the cooperation evidence.

B.    Cross-Examination

Mustafa argues that the district court erred in allowing the government, on cross-examination, to elicit the fact of his 2006 United Kingdom conviction on six counts of soliciting murder and related counts of inciting racial hatred. The district court allowed the cross-examination pursuant to Fed. R. Crim. P. 609(a)(1)(B), which states that when a criminal defendant is a witness in his own case, evidence of prior criminal convictions "must be admitted" for purposes of impeachment "if the probative value of the evidence outweighs its prejudicial effect."

The law "presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." *United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005). The government argued, and the district court agreed, that the presumption was reinforced here by Mustafa's direct testimony suggesting that (1) his lengthy incarceration to date was "all about" the United States charges, Trial Tr. 2984; and (2) his singular intent was to calm potentially violent situations within the Finsbury Park Mosque community.

26

This comports with precedent recognizing that where a defendant testifies on direct examination about specific facts, the prosecution may use cross-examination to prove that the defendant lied as to those facts. *See United States v. Garcia*, 936 F.2d 648, 653 (2d Cir. 1991).

The district court further concluded that the probative value of Mustafa's United Kingdom convictions outweighed their potential for unfair prejudice because the government would only be allowed to ask six pre-identified questions, none of which probed the underlying facts. In challenging the district court's prejudice assessment, Mustafa argues, *inter alia,* that it would have been sufficient for the government to elicit the general fact of a United Kingdom conviction without identifying the particular crimes of conviction. This might persuade if the convictions were intended to impeach only Mustafa's cause-for-incarceration representation. But the government was further seeking to impeach Mustafa's peacemaker assertion, which was directly rebutted by the particular crimes of conviction. In urging otherwise, Mustafa observes that his United Kingdom convictions were based on his possession of seized materials already before the jury in this case, that the possession of such materials would not be a violation of United States law, and that the defense should have been allowed to make that point to the jury, or the district court itself should have so instructed. Assuming *arguendo* that we were to agree that defense argument or court instruction would have been warranted to minimize prejudice, any error would not secure Mustafa relief from judgment. That is because the evidence of his guilt on the crimes charged in this case was overwhelming, consisting of

direct evidence from co-conspirators and Mustafa himself, as well as extensive physical evidence and documentary corroboration.   *See* Fed. R. Crim. P. 52(a) (stating that error not affecting "substantial rights must be disregarded"); *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (holding erroneous admission of evidence harmless given overwhelming evidence of defendants' guilt).

Mustafa also faults the district court for allowing the government to cross-examine him about a bomb-making manual purportedly found in his United Kingdom prison cell. Because Mustafa voiced no objection to these questions in the district court, we review only for plain error, which is not evident here.   *See United States v. Certified Envtl. Servs. Inc.*, 753 F.3d 72, 96 (2d Cir. 2014).   The inquiry was relevant to Mustafa's peacemaker assertions and not unduly prejudicial because no manual was admitted into evidence and Mustafa denied its possession, leaving the government with no contrary evidence from which to argue otherwise.

In sum, no asserted errors in Mustafa's direct- or cross-examination warrant relief from judgment.

V.      The Conscious Avoidance Charge

At trial, Mustafa disputed both his participation in and knowledge of the charged conspiracies and related substantive crimes.   Thus, the district court gave the jury a conscious-avoidance charge on the element of knowledge.   *See United States v. Ebbers*, 458 F.3d 110, 124 (2d Cir. 2006) (holding such charge appropriate when (1) element of knowledge is in dispute, and (2) evidence would permit rational juror to conclude beyond

28

reasonable doubt that defendant "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact").[7]

Mustafa argues that the charge lacked the necessary factual predicate. Because he raised this objection in the district court, our review is *de novo*. *See United States v. George*, 386 F.3d 383, 397 (2d Cir. 2004). Nevertheless, we reject the charging challenge as without merit.

---

[7] The district court charged the jury as follows:

> In connection with your consideration of a charged conspiracy, if you find beyond a reasonable doubt that the defendant intentionally participated in a conspiracy, but that the defendant deliberately and consciously avoided learning or confirming certain facts about the specific objectives of the conspiracy, then you may infer from his willful and deliberate avoidance of knowledge that the defendant did understand the objectives or goals of the conspiracy.

> There is a difference between knowingly joining and participating in a conspiracy on the one hand and knowing the object or the purpose of the conspiracy on the other. Conscious avoidance cannot be used as a substitute for finding that the defendant knowingly joined the conspiracy and knew that he was becoming a party to an agreement to accomplish an alleged illegal purpose. It is, in fact, logically impossible for a defendant to join a conspiracy unless he knows the conspiracy exists. The defendant must know that the conspiracy is there.

> However, in deciding whether the defendant knew the objectives of the conspiracy, you may consider whether the defendant was aware of a high probability that the objectives of the conspiracy were to commit the crime or crimes charged as the object of the conspiracy, and nevertheless participated in the conspiracy.

Trial Tr. 3665–66.

As to the Yemeni kidnapping counts, Mustafa's own statements revealed that he and unindicted co-conspirator Abu Hassan al-Midhar viewed the kidnapping of non-Muslims in predominantly Muslim countries as justified, warned non-Muslims not to travel to Yemen, and sought to extort the Yemeni government into releasing Mustafa's incarcerated relative and followers. From these facts, among others, a jury could find that there was a high probability that a terrorist group in Yemen, such as the Islamic Army of Aden for which Mustafa was an outspoken supporter, would kidnap non-Muslim tourists in Yemen to use as hostages in bargaining for the government's release of Mustafa's relative and followers, and that if Mustafa lacked actual knowledge of this plan, it was only because he consciously avoided learning or confirming it.

As to the training camp crimes, a jury could find that Ujaama's faxes to Mustafa, reporting that the camp "look[ed] just like Afghanistan" and contained a "stock-pil[e] [of] weapons and ammunition," GX 315, would have alerted Mustafa to the high probability that the camp's purpose was to train fighters who could be provided as material support to terrorists operating in Afghanistan, such that if he lacked actual knowledge of that fact, it was only because he consciously avoided learning or confirming it. Although Mustafa testified that he did not read the quoted fax, the jury was entitled to discredit his testimony, which, on appeal, we must assume it did, and to find instead that Mustafa knew or consciously avoided knowing the import of the information contained therein.

As to the provision of Abbasi as material support for terrorism and al Qaeda, record evidence showed that Mustafa arranged for Ujaama to deliver Abbasi to Ibn Sheik al Liby

30

at a terrorist training camp in Afghanistan. Because a number of al Qaeda terrorists were trained at the camp and Ibn Sheik al Liby would himself lead al Qaeda forces against the United States military at Tora Bora, a jury could find such a high probability that the camp was an al Qaeda training site that if Mustafa did not know that in fact, it was only because he consciously avoided learning or confirming what was otherwise apparent.

Mustafa submits that, even if there was a factual basis for charging conscious avoidance, the district court erred in using the phrase "high probability" to do so because it confused the jury as to the government's burden to prove guilt beyond a reasonable doubt, thereby "dilut[ing]" the government's burden of proof. Appellant Br. 160–61. The argument is defeated by precedent, which repeatedly employs the phrase to define the conscious-avoidance doctrine. *See*, *e.g.*, *United States v. Lange*, 834 F.3d 58, 76 (2d Cir. 2016) (explaining defendant must consciously avoid learning fact "while aware of a high probability of its existence"); *United States v. Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) ("'When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.'" (quoting *Leary v. United States*, 395 U.S. 6, 46 n.93 (1969))); *United States v. Ebbers*, 458 F.3d at 124; *see also* Sand, *et al.*, 1 Modern Federal Jury Instructions—Criminal §3A-2 (2008) (employing "high probability" phrase in pattern conscious-avoidance charge). Moreover, the district court's charge, viewed as a whole, made plain to the jury that nothing less than proof beyond a reasonable doubt could support guilty verdicts in the case. *See* Trial Tr. 3613–15; *United States v. Doyle*,

31

130 F.3d at 536 (requiring assessment of challenged jury charge "taken as a whole, in order to determine whether there is a reasonable likelihood that the jury misinterpreted the *reasonable doubt instruction*" (emphasis in original)).

VI.     Constructive Amendment and Variance

Mustafa contends that evidence of Kassir's and Aswat's activities in Seattle, Washington, after they left the Bly training camp, constructively amended Counts Three through Six, a *per se* violation of the Grand Jury Clause. *See* U.S. Const. amend. V; *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). "To prevail on a constructive amendment claim, a defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (emphasis and internal quotation marks omitted). If the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment, there is only a variance, which warrants no relief from judgment unless a defendant can show prejudice. *See United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007); *United States v. Salmonese*, 352 F.3d at 621.

Mustafa cannot show constructive amendment here because, although the titles of Counts Three through Six all contain parentheticals referencing "the Bly, Oregon Jihad Training Camp," the paragraphs stating what "the grand jury . . . charges" all plead material

32

support crimes "within the United States." A 58–65. The indictment references the Bly camp in certain overt acts of conspiracy Counts Three and Five, but overt acts illustrate how a conspiracy is carried out; they do not conclusively define the scheme. *See United States v. Bertolotti*, 529 F.2d 149, 158 (2d Cir. 1975) ("We do not believe . . . that the scope of a charged conspiracy is properly measured by the nature of the overt acts alone."); *see also United States v. Milstein*, 481 F.3d 132, 135 (2d Cir. 2007) ("It is well settled that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment so long as there is no prejudice to the defendant." (alterations and internal quotation marks omitted)); *cf. United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013) (recognizing indictment's 'to wit' clause as illustrative rather than definitional of core criminality charged by grand jury). Thus, evidence of events at the Seattle mosque after defendants Kassir and Aswat left the Bly camp did not "modify essential elements of" the charged conspiracy so as to create any likelihood that Mustafa was convicted for a conspiracy "other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d at 416 (emphasis omitted). Rather, the Seattle evidence was highly probative of defendants' purpose "within the United States," *i.e.*, to provide material support for terrorism, particularly for al Qaeda, through martial training in Bly, Oregon or elsewhere.

To the extent Mustafa recasts his constructive amendment argument as a variance challenge, it fails because he cannot show that he was unfairly prejudiced by the Seattle evidence, much of which was disclosed in discovery.

33

VII.    Sentencing Challenge

Mustafa argues that the district court's failure to recommend that he serve his life sentence at a medical facility or, at least, not in the maximum-security prison in Florence, Colorado ("ADX Florence"), rendered his sentence procedurally and substantively unreasonable.   Mustafa claims that such a recommendation was procedurally required to satisfy commitments made by the United States to secure his extradition from the United Kingdom.   *See United States v. Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007) (holding that rule of specialty requires "adhere[nce] to any limitations placed on prosecution by the surrendering country"); *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) ("[C]ourts should temper their discretion in sentencing an extradited defendant with deference to the substantive assurances made by the United States to an extraditing nation.").   In any event, he argues that the scope of his disabilities—Mustafa lacks both of his hands—makes a life sentence substantively unreasonable in the absence of the urged designation recommendation.   The arguments fail for at least two reasons.

First, the record does not support Mustafa's commitment assertion.   A declaration from the ADX Florence warden, submitted by the United States in the extradition proceedings, states that "[*i*]*f* it is determined" that Mustafa "cannot manage his activities of daily living, it is highly *unlikely* that he would be placed at the ADX but, rather, at a medical facility." App'x 87 (emphasis added).[8]   The declaration further states that "[i]t is

---

[8]  During Mustafa's pre-trial detention at the Metropolitan Correctional Center, the Bureau of Prisons arranged for him to receive new prosthetic devices and employed an occupational therapist to advise as to necessary accommodations.

34

the *goal* of the ADX to transfer inmates to less secure institutions *when the inmate* demonstrate[s] that a transfer is warranted and he no longer needs the controls of the ADX." *Id.* at 92 (emphasis added). The highlighted language—conditional, qualified, and aspirational—expressed no commitment. To the contrary, it alerted the surrendering courts that there was some possibility that Mustafa could be designated to ADX Florence. The surrendering courts acknowledged this possibility, but assumed such confinement would be for a relatively short time. No court, however, translated such an assumption into a specific condition of extradition. *See*, *e.g.*, *United States v. Feliz*, 201 F. App'x 814, 816–17 (2d Cir. 2006) (referencing "explicit[] . . . condition" of extradition prohibiting death penalty). Thus, to the extent Mustafa's sentencing challenge depends on a commitment or condition not evident in the record, it necessarily fails.

Second, even if Mustafa's extradition had been conditioned on a United States promise not to incarcerate him at ADX Florence—which it was not—the district court did not err in failing to include a recommendation against that designation in its judgment. Such an extradition condition, to the extent it binds the United States, necessarily binds its agencies without need for any action by a court. The Bureau of Prisons ("BOP") is charged by law with the responsibility for designating convicted federal defendants to appropriate penal facilities, *see* 18 U.S.C. § 3621(b), and while the BOP is required to consider a district court's designation recommendation, among other factors, *see id.* § 3621(b)(4)(B), the statute does not require either that district courts make such recommendations or that the BOP follow those that are made, *see United States v. Williams*,

65 F.3d 301, 307 (2d Cir. 1995) (stating that "sentencing court has no authority to order that a convicted defendant be confined in a particular facility" because that decision is "within the sole discretion of the Bureau of Prisons"); *accord Levine v. Apker*, 455 F.3d 71, 83 (2d Cir. 2006); *Thye v. United States*, 109 F.3d 127, 130 (2d Cir. 1997).

Thus, whatever collateral challenge Mustafa might bring against the BOP for the place or conditions of his incarceration, *see Levine v. Apker*, 455 F.3d at 78 (referencing possible action against BOP pursuant to 28 U.S.C. § 2241), he cannot show that the district court's failure to make a discretionary recommendation that the BOP would not be required to follow renders his sentence either procedurally or substantively unreasonable.[9]   As to the latter, given the severity of Mustafa's criminal conduct, we cannot conclude a within-Guidelines sentence of life imprisonment was outside the wide range of permissible decisions available to the district court, even in the defendant-specific circumstances of this case.   *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2009) (*en banc*); *accord United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (explaining that sentence is substantively unreasonable if it is "shockingly high, shockingly low, or otherwise

---

[9] The district court was aware of its discretion to make a designation recommendation, but declined to do so, referencing the "particular[] difficult[y]" in grappling "with both the medical concerns and the security concerns" presented by Mustafa, and concluding "that the BOP is particularly expert at understanding those concerns" and evaluating them "together." App'x 643–45; *see generally Turner v. Safley*, 482 U.S. 78, 84 (1987) (recognizing that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" (internal quotation marks omitted)). Nevertheless, the district court, which had played an active role in ensuring Mustafa's pre-trial medical care, urged the BOP to consider Mustafa's doctor's report submitted at sentencing and to arrange for an evaluation by an independent occupational therapist.   *See* App'x 649–50.

unsupportable as a matter of law"); *United States v. Ryan*, 806 F.3d 691, 695 (2d Cir. 2015) (recognizing that in "overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances" (internal quotation marks omitted)).

VIII.   The Ujaama Faxes

Mustafa urges us to identify error in the district court's denial of his post-trial motion for further discovery as to two faxes sent by Ujaama to Mustafa in October and November 1999, which Mustafa submits may have been obtained in violation of the Fourth Amendment, thus warranting suppression.   Mustafa's ability to pursue suppression is called into question by precedent.   *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990) (holding that foreign national cannot raise Fourth Amendment challenge to searches conducted abroad); *accord In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 171 (2d Cir. 2008); *see also Unites States v. Getto*, 729 F.3d 221, 233 (2d Cir. 2013) (declining to adopt "joint venture doctrine" to Fourth Amendment challenge). Even if he could clear this hurdle, however, he cannot show that the district court erred in declining to grant him discovery given the untimeliness of his request.   The government produced the faxes on October 11, 2012, and Mustafa did not timely move for suppression (or further discovery in anticipation of such a motion) either before his 2014 trial, as required by Fed. R. Crim. P. 12(b)(3)(C) & (E) and Rule 12(c)(1), or during trial as allowed

by the district court, *see* Rule 12(c)(3). Instead, Mustafa waited until after trial to file his motion.

A district court is not required to entertain an untimely motion and its discretion to do so depends upon the movant showing good cause. *See* Fed. R. Crim. P. 12(c)(3). Mustafa made no such showing in the district court, nor does he do so on appeal. In these circumstances, we identify no district court error in the denial of Mustafa's motion, nor will we entertain suppression arguments raised for the first time on appeal. *See United States v. Martinez*, 862 F.3d 223, 234 (2d Cir. 2017) (deeming suppression argument barred by defendant's failure to move for suppression of evidence in question in district court); *United States v. Yousef*, 327 F.3d 56, 125 (2d Cir. 2003) (same, where defendant "had ample opportunity to raise and develop [suppression] argument before the District Court and he has not provided, much less established, any reasonable excuse for his failure to so").

We have considered Mustafa's other arguments and conclude that they are without merit. Accordingly, we AFFIRM the judgment of conviction in all respects except as to Counts Seven and Eight, which we REVERSE.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court